# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

James R.,                                    Case No. 24-cv-02049 (ECW)

    Plaintiff,

v.                                                    **ORDER**

Frank Bisignano,[1]
*Commissioner of Social Security*,

    Defendant.

---

This matter is before the Court on Plaintiff James R.'s ("Plaintiff") brief seeking remand or reversal of the Commissioner's decision to deny him Title II Disability Insurance benefits (Dkt. 6); and Defendant Commissioner of Social Security Administration Frank Bisignano's ("the Commissioner") brief in opposition (Dkt. 13).[2]

---

[1] The Complaint named Martin J. O'Malley, who was the Commissioner of Social Security Administration when Plaintiff filed his Complaint. (*See* Dkt. 1.) Frank Bisignano became the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

# I.    PROCEDURAL BACKGROUND

On July 11, 2022, Plaintiff filed an application for Title II Disability Insurance benefits alleging disability as of March 1, 2018,[3] based on combat related stress, sleep apnea, insomnia, hyper attentiveness, anger management, and anhedonia.  (R. 209-211, 216-226, 299, 303.)[4]  Plaintiff's application was denied initially and on reconsideration.  (R. 98, 102.)  Plaintiff filed a written request for a hearing before an administrative law judge and a hearing occurred on February 26, 2024, before Administrative Law Judge Brenda Rosten ("the ALJ").  (R. 14-27.)

In a decision dated June 22, 2022, the ALJ concluded that Plaintiff was not disabled.  (R. 11-27.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a)(4),[5] the ALJ first determined at step one that Plaintiff had not engaged in

---

[3]    The Court notes that while it states in the ALJ's decision that Plaintiff had an amended disability onset date of July 1, 2019 (R. 16), the ALJ ultimately determined Plaintiff had not been under a disability, as defined in the Social Security Act, from March 1, 2018, through the date of the ALJs' decision.  (R. 27.)  As a result, the Court treats the onset of disability as March 1, 2018.

[4]    The Social Security Administrative Record ("R.") is available at Docket 4.

[5]    The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the

substantial gainful activity since July 1, 2019 and that he met the insured status requirements of the Social Security Act through December 31, 2025. (R. 16.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: insomnia secondary to obstructive sleep apnea; obesity; major depressive disorder, moderate, chronic; generalized anxiety disorder, chronic; panic disorder, with specific phobias; post-traumatic stress disorder ("PTSD"); and alcohol use disorder. (R. 16.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 17-20.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform less than a full range of medium work as defined in 20 CFR 404.1567(c). The claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently. He can sit up to a maximum of 6 hours in an 8-hour workday and stand and/or walk combined up to a maximum of 6 hours in an 8-hour workday. He should never climb ladders, ropes, or scaffolds, but can frequently climb ramps and stairs. The claimant can frequently balance as defined in the Selected Characteristics of Occupations (SCO), and frequently stoop, kneel, crouch, and crawl. He should have no exposure to work around extreme heat and hazards, such as unprotected heights and fast and dangerous moving machinery. The claimant can tolerate occasional, cursory, non-collaborative interactions with co-workers, but is not able to engage in work that is in tandem or interdependent with co-workers. He is limited to only incidental contact with the public, meaning he could work in proximity to the

---

claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).

public, but should have no responsibility for serving the public directly. The claimant is limited to a moderate noise environment, where the term "moderate" is defined as a business office where typewriters are used; department store; grocery store; light traffic; fast food restaurant at off hours.

(R. 20-21.)

The ALJ found that Plaintiff could not perform his past relevant work. (R. 25-26.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that given Plaintiff's age, education, work experience, and RFC, there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, including work as: Custodian, DOT# 389.667-010, unskilled, SVP 2, medium, approximately 38,000 jobs in the national economy; Hospital Housekeeper, DOT# 323.687-010, unskilled, SVP 2, medium, approximately 40,000 jobs in the national economy; and Lab Equipment Cleaner, DOT# 381.687-022, unskilled, SVP 2, medium, approximately 25,000 jobs in the national economy. (R. 26-27.)

Accordingly, the ALJ found Plaintiff not disabled. (R. 27.)

Plaintiff filed a request for review of this decision, and the Appeals Council denied further review on April 22, 2024, which made the ALJ's decision the final decision of the Commissioner. (R. 1-6.)

Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g). (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented by the parties.

## II.    RELEVANT RECORD

On April 11, 2018, the Department of Veterans Affairs made the following determinations with respect to Plaintiff's service-connected disabilities, or the lack thereof:

1.    Service connection for cervical strain with degenerative arthritis of spine and intervertebral disc syndrome (claimed as neck condition) is granted with an evaluation of 30 percent effective April 11, 2017.

2.    Service connection for femoral acetabular impingement syndrome and iliopsoas tendinitis, left hip (also claimed as bilateral hip condition) is granted with an evaluation of 10 percent effective April 11, 2017.

3.    Service connection for femoral acetabular impingement syndrome and iliopsoas tendinitis, right hip (also claimed as bilateral hip condition) is granted with an evaluation of 10 percent effective April 11, 2017.

4.    Service connection for knee strain, instability and patellofemoral pain syndrome, left is granted with an evaluation of 10 percent effective April 11, 2017.

5.    Service connection for tinnitus is granted with an evaluation of 10 percent effective April 11, 2017.

6.    Service connection for hearing loss, bilateral is granted with an evaluation of 0 percent effective April 11, 2017.

7.    Service connection for radiculopathy, left upper extremity, lower, middle and upper radicular group nerves is granted with an evaluation of 20 percent effective April 11, 2017.

8.    Service connection for radiculopathy, right upper extremity, lower, middle and upper nerve roots is granted with an evaluation of 20 percent effective April 11, 2017.

9.    Service connection for anxiety is denied.

10.    Service connection for depression is denied.

11.    A decision on entitlement to compensation for asthma (related to environmental hazard in Gulf War) is deferred.

12.    A decision on entitlement to compensation for chronic fatigue syndrome (related to environmental hazard in Gulf War) is deferred.

13.    A decision on entitlement to compensation for heart condition is deferred.

14.    A decision on entitlement to compensation for post-traumatic stress disorder (PTSD) is deferred.

(R. 251-52; *see also* R. 243-44.)

On April 12, 2018, Plaintiff reported being chronically fatigued since his deployment to Iraq. (R. 968.) It was noted that no medication was required for Plaintiff's fatigue; his fatigue had not reduced his daily activity level to less than 50% of his pre-illness level; he had no cognitive impairment due to his fatigue; the fatigue did not impair his daily activities; while there was a purported period of incapacitation, it was found that Plaintiff did not meet the criteria for a diagnosis of chronic fatigue syndrome, and it did not impact his ability to work. (R. 969.)

On April 19, 2018, Plaintiff requested Ambien because his sleep cycle became disrupted. (R. 1286.) Plaintiff was pleasant during the appointment and noted that the Ambien did not cause any unusual behaviors or changes in mood. (R. 1286.)

On May 31, 2018, it was noted that Plaintiff's sleep apnea did not interfere with his ability to work. (R. 752.) Plaintiff also asserted that his CPAP machine helped him to sleep better. (R. 1282.) Plaintiff's sleep apnea was characterized as mild. (R. 1283.)

On June 14, 2018, Plaintiff denied any fatigue, despite his troubles with sleeping. (R. 765-66.)  He also denied any depression or anxiety, and claimed no musculoskeletal pain.  (R. 766.)

On April 26, 2019, Plaintiff reported having lost his CPAP machine and wanting to retry therapy, having not adjusted to the treatment.  (R. 563.)

On May 15, 2019, Plaintiff complained of pain in the big toe ball of his right foot, and ankle swelling that he attributed to gout.  (R. 560.)  On May 22, 2019, Plaintiff presented to the emergency department with reports of right foot pain and tingling attributed to gout.  (R. 545-48.)  Plaintiff was not deemed a fall risk.  (R. 545.)  Slight edema was noted without tenderness.  (R. 554.)  Plaintiff treated his gout by drinking pineapple juice.  (R. 947.)

On May 31, 2019, Plaintiff sought a therapist for his depression, anxiety, and PTSD, but acknowledged that he had never undergone any treatment for his mental health problems.  (R. 534, 938.)  Plaintiff's anger centered round family disputes.  (R. 542.)  Imaging of his right foot on the same day revealed mild swelling medial to the MTP joint, minimal joint space loss, and mild degenerative changes of the great toe.  (R. 536; *see also* R. 941.)  The foot was otherwise normal.  (R. 536, 1024.)  The assessment for Plaintiff was gout, treated with diet, which had resolved.  (R. 536.)

On the same day, Plaintiff reported that he had started suffering from sleep apnea beginning in September 2015.  (R. 620.)  Plaintiff's sleep apnea did not affect his ability to work.  (R. 622.)

On June 14, 2019, Plaintiff denied any depression, anxiety, fatigue, or any pain. (R. 957.)

On July 12, 2019, Plaintiff reported gout-like symptoms involving pain on the ball of his right foot, with a pain level of 7 out of 10, making it difficult to ambulate. (R. 934.) Plaintiff had been treating the condition with home remedies. (R. 934.)

On July 16, 2019, Plaintiff reported no fatigue, no depression, anxiety, or PTSD symptoms. (R. 654.) It was noted that Plaintiff was moving to Tampa, Florida for a new job. (R. 655.)

On August 15, 2019, Plaintiff presented for a lab review and noted no health concerns. (R. 530.) Plaintiff did not have any significant pain to report. (R. 528.) Plaintiff reported sleep apnea and that he had gotten out of practice of using his CPAP, but acknowledged sleeping better when using the machine. (R. 530.) Plaintiff reported moving out of his apartment in Tampa and that his things were in storage. (R. 1243.) Plaintiff planned to spend four months in France. (R. 1243.)

On August 20, 2019, Plaintiff presented to the emergency department with complaints that he could not control his emotions and anger. (R. 516, 913.) Plaintiff reported losing his temper and throwing a glass at a wall. (R. 522.) Plaintiff denied harming others or threatening others. (R. 522.) Plaintiff noted increasing agitation over the past year related to interactions with his family members. (R. 523.) Plaintiff appeared to be pleasant. (R. 516.) The examination of Plaintiff showed that he was alert and cooperative; his speech was normal in tone and rate; he had no abnormal movement; he had good eye contact; his affect was labile, tearful, congruent with content; his mood

was dysphoric and sad; thought process was linear; thought content was absent for homicidal ideation or delusions; he endorsed no hallucinations; insight about his illness and need for treatment was fair; judgment was fair; and impulse control was impaired. (R. 527.)  Plaintiff was discharged the same day and drove himself home.  (R. 523.) Plaintiff was given hydroxyzine[6] for his anxiety.  (R. 527.)

On September 3, 2019, Plaintiff presented with symptoms of anxiety and depression.  (R. 907.)  Plaintiff reported anxiety leading to anger outbursts in interpersonal relationships, with the outbursts creating guilt and fear of the relationships, and tension for family members.  (R. 907.)  Plaintiff endorsed daily symptoms of hyperarousal.  (R. 907.)  Plaintiff's affect was depressed, tearful, anxious, and angry.  (R. 909.)  Impulse control was fair.  (R. 909.)  Plaintiff had no history of psychiatric hospitalizations.  (R. 909.)  It was also noted that Plaintiff was obese.  (R. 909.)

On September 19, 2019, Plaintiff reported trauma anxiety based on his past military service.  (R. 903.)  He claimed impaired interpersonal and social functioning due to symptoms of hyperarousal and alteration in mood leading to him being a "hermit."  (R. 903.)  Plaintiff used alcohol to help him sleep.  (R. 903.)  The examination of Plaintiff showed that his attitude was open and cooperative; he was appropriately dressed with good hygiene; his eye contact, gait, and posture were within normal limits; speech was mostly normal, but he became more circumstantial as his distress increased; his mood

---

[6]     Hydroxyzine "is used to relieve itching caused by allergic skin reactions.  It is also used to relieve anxiety and tension."  *Hydroxyzine*, MedlinePlus https://medlineplus.gov/druginfo/meds/ a682866.html [https://perma.cc/57WJ-YZZJ] (last visited September 17, 2025).

was depressed; his affect was full, irritable, anxious, melancholy, and congruent with mood; his thought content was logical and goal directed; and he had no delusions. (R. 903.)

On September 25, 2019, Plaintiff sought help managing negative emotions. (R. 494, 898.) Plaintiff reported that he had low frustration tolerance, he easily "snaps," and worried about exploding at others. (R. 494.) Plaintiff claimed that this started in 2006, but that he was now seeking help "because he was laid off from his job and he has some additional time." (R. 494.) Plaintiff asserted that during some unspecified point in time (reported during this visit as in 2018, but reported by Plaintiff at other times as occurring in 2015 and 2019), he pulled a man off a motorcycle because the person made an obscene gesture and ended up repeatedly hitting the man. (R. 413, 494; *see also* R. 362, 1479.) Plaintiff claimed that he otherwise had been doing "okay" with mild depression that he had lived with for a long time, even before his time in the army. (R. 494.) He wished he could be more social and asserted significant issues with falling asleep without alcohol. (R. 494.) Plaintiff's examination showed that he was alert and pleasant, he could walk easily on his own, his speech was fluent, his mood was "a little depressed"; his affect was congruent, his concentration and attention were normal, his memory was fully intact, his thought content was normal, and he showed both good insight and judgment. (R. 497.) Treatment-wise, Plaintiff was hesitant to taking long-term scheduled medication, as he wanted to think about this, and "talk with his friends before proceeding." (R. 498.)

Plaintiff was interested in propranolol[7] for managing acute symptoms, and was provided with a prescription.  (R. 498.)  The diagnosis for Plaintiff was PTSD, moderate depressive disorder, and high-risk alcohol use.  (R. 498.)

On October 16, 2019, Plaintiff was again seen for a psychiatric evaluation noting he struggled with managing his anger.  (R. 488, 1217.)  At the previous visit, Plaintiff had been started on propranolol to manage anger/irritability, but he reported not taking the medication.  (R. 488.)  Even still, he requested starting the medication, as well as an antidepressant.  (R. 488.)  Plaintiff noted reducing his alcohol consumption.  (R. 488.)  Plaintiff's mental examination showed that he was alert and pleasant, his speech was fluent, his affect was congruent, his concentration and attention were normal, his memory was fully intact, his thought content was normal, and he showed both good insight and judgment.  (R. 490-91.)  It was noted that Plaintiff, a 52-year-old male, presented with difficulties managing negative emotions that began during his service in the army, and this anger management made it difficult integrating back into civilian life.  (R. 491.)  Plaintiff was to start taking propranolol.  (R. 491.)

On November 12, 2019, Plaintiff claimed strain on his back stemming from grouse hunting, deer hunting, and walking his property lines.  (R. 893.)  Plaintiff sought a referral for physical therapy.  (R. 893.)  Therapy does not appear to have occurred and was discontinued, as Plaintiff did not respond to scheduling efforts.  (R. 453.)

---

[7]    Propranolol is a beta blocker heart medication that has also been used to treat symptoms of anxiety.  *See Propranolol (Cardiovascular)*, MedlinePlus https://medlineplus.gov/druginfo/meds/a682607.html, [https://perma.cc/B7BA-HBPH] (last visited Sept. 17, 2025).

On December 4, 2019, Plaintiff was seen for a psychiatric evaluation noting difficulty with managing his anger. (R. 412, 483.) At his previous visit, it was recommended that he start Cymbalta[8] for his mood and propranolol to manage anger/irritability, which he failed to take because "he is still not certain he has gotten to a point where he feels that these medications are necessary." (R. 412.) He noted he would be traveling to France and Tampa. (R. 413.) Plaintiff's mental examination showed that he was alert and attentive, his speech was fluent, he claimed he was "doing okay," his concentration and attention were normal, his memory was fully intact, and he showed both good insight and judgment. (R. 414-15.) It was suspected that the cause of his irritability was his PTSD. (R. 415.) Plaintiff remained hesitant to take any medications, but it appeared to the medical provider that he was "generally stable and appears to be making positive changes, especially with continued reduction in alcohol consumption." (R. 415.)

On February 7, 2020, the VA issued the following disability finding:

We have assigned a 70 percent evaluation for your unspecified trauma and stressor related disorder based on:

• Forgetting names
• Gross impairment in communication
• Unprovoked irritability with periods of violence
• Inability to establish and maintain effective relationships
• Disturbances of motivation and mood
• Mild memory loss
• Forgetting recent events
• Impaired impulse control

---

[8] Cymbalta is a medication used to treat depression. *See Cymblata*, Nat'l Cancer Inst., https://www.cancer.gov/publications/dictionaries/cancer-terms/def/cymbalta [https://perma.cc/M9SY-WHQA] (last visited September 23, 2025).

• Chronic sleep impairment
• A mental condition has been formally diagnosed, but symptoms are not severe enough either to interfere with occupational and social functioning or to require continuous medication
• Gross impairment in thought processes
• Forgetting directions

The overall evidentiary record shows that the severity of your disability most closely approximates the criteria for a 70 percent disability evaluation.

(R. 281-82.)

On March 3, 2020, Plaintiff was seen in the emergency department for a skin rash. (R. 407.) His list of active problems included gout, high cholesterol, and sleep apnea. (R. 407.) His examination was normal, with him smiling, being pleasant, and ambulating without assistance. (R. 408.)

On June 30, 2020, Plaintiff reported not having any gout flare-ups over the past year. (R. 738.) Any discomfort was addressed with over-the-counter pain medications. (R. 738.) Plaintiff was taking medication for his gout and hydroxyzine for anxiety. (R. 738.) Plaintiff's depression screening was negative for depression. (R. 1198.)

On July 1, 2020, Plaintiff reported interest in re-engaging in psychotherapy. (R. 674, 1191.) Plaintiff noted that he was "'doing a little better now days' in terms of managing startle response, coping strategies, and emotion regulation overall, but would like to address ongoing concerns through psychotherapy." (R. 674.)

On July 17, 2020, Plaintiff had a telephone psychotherapy session. Plaintiff lived in Tampa and had family in Minnesota. (R. 685, 1187.) Plaintiff described that he had a close relationship with his adult son, but not with his brothers who teased him. (R. 685.)

13

Plaintiff claimed that he had a short temper and would be startled by loud noises. (R. 685.) Plaintiff also endorsed flashbacks. (R. 685.) Plaintiff's diagnosis was anxiety disorder. (R. 685.)

On July 21, 2020, Plaintiff had another telephone psychotherapy session. Plaintiff shared that he had experienced increased irritability, family stress, and difficulties managing negative emotions and frustrations. (R. 682, 1186.) He also reported that his strained relationship dynamics with his brothers compounded his ongoing anxiety. (R. 682.)

On July 30, 2020, Plaintiff underwent another telephone psychotherapy session. (R. 786, 1183.) His mental health examination showed that his mood was dysthymic, he had a full and appropriate affect, normal speech, and appropriate thought process and content, he was alert, had cognition within limits, and a good awareness of his problems. (R. 787-88.) He denied wanting to hurt others. (R. 788.) Plaintiff endorsed moderate to severe depression, and anxiety symptoms, which he claimed he had experienced for several years. (R. 681.) His stressors involved his family members. (R. 679, 788.)

On August 12, 2020, Plaintiff presented as irritable, becoming aggravated when discussing his family, as well as endorsing symptoms of depression. (R. 793-95, 857.) Plaintiff claimed an anger problem, including that he broke his sink. (R. 702.) Plaintiff was increasing the use of isolation as coping mechanism. (R. 705.) Plaintiff admitted to engaging in contract work. (R. 703.) The diagnosis for Plaintiff was a provisional PTSD diagnosis, unspecified depressive disorder, and alcohol use disorder. (R. 705.) His speech was normal, he showed no delusions, his thought process was normal, his thought

content was within normal limits with some possible paranoia; he reported homicidal ideation, but denied any plan or intent, and his current risk was considered low. (R. 795.) His memory was characterized as good, and his insight and judgment were intact. (R. 795.)

On August 25, 2020, Plaintiff was seen for a Social Security Administration ("SSA") consultation by Eniola Owi, MD, related to Plaintiff's claim of disability as to his hearing loss, neck, hips, and joint problems. (R. 692.) Plaintiff complained of morning stiffness in the left side of his neck with motion. (R. 692.) He also complained that his left buttock was the site of his hip pain, which had begun in 2004. (R. 692.) He noted pain in his buttock if he walked for a mile, which radiated to his left knee. (R. 692.) He also noted soreness in the knees for decades with no imaging and treatment. (R. 692.) In addition, Plaintiff complained of soreness and stiffness of the ankle for 5-6 years when first standing in the morning. (R. 692.) Dr. Owi noted service-related disabilities psychosis, sleep apnea, intervertebral disc syndrome, paralysis of radicular nerves, thigh and knee conditions, impaired hearing, and tinnitus. (R. 692.) Plaintiff's medications included menthol cream, propranolol, loratadine,[9] lidocaine cream, clobetasol,[10] and one 800-mg Advil every other day. (R. 692.) His past medical history

---

[9]    Loratadine is used to temporarily relieve runny nose; sneezing; and redness, itching, and tearing of the eyes caused by allergies. Loratadine is in a class of medications called antihistamines. *See Loratadine*, MedlinePlus,https://medlineplus.gov/druginfo/meds/a697038.html [https://perma.cc/LT7T-K9FD] (last visited Sept. 19, 2025).

[10]    Clobetasol is used to treat the itching, redness, dryness, crusting, scaling, inflammation, and discomfort of various scalp and skin conditions, including psoriasis.

included sleep apnea, hyperlipidemia, gout, and tachycardia.  (R. 692-93.)  The examination of Plaintiff showed that he was in no acute distress.  (R. 693.)  There was no tenderness or spasm to palpation of Plaintiff's spine, but he reported neck tightness with motion.  (R. 693.)  Seated and supine straight leg raise tests were negative.  (R. 693.)  Upper extremities were normal.  (R. 693.)  Plaintiff's knee was nontender without pain, but there was some crepitus with motion and a bruise from a recent fall on his leg.  (R. 693.)  Strength was normal to the extremities.  (R. 693.)  Gait was normal without an assistive device, he was able to do one-legged stance with each leg, Romberg test[11] and tandem gait were normal, he was able to walk on heels and toes, and was able to get onto and off the exam table without assistance.  (R. 693.)  Plaintiff had full range of motion of his cervical spine, lumbar spine, shoulders, elbows, wrists, hands, fingers and thumbs, hips, knees, ankles, and feet, except that the extension of his knee flexion was 140 degrees of range out of 0-150 degrees, and his hip flexion was limited to 90 degrees out of 100.  (R. 695-97.)  Plaintiff's psychiatric examination was normal.  (R. 693.)  Dr. Owi assessed Plaintiff with multiple joint pain and a history of hearing loss.  (R. 694.)

---

*See Clobetasol Topical*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a686008.html [https://perma.cc/VV4V-2V9G] (last visited Sept. 19, 2025).

[11]    The Romberg test is a simple and short physical test that healthcare providers use to access whether a patient has balance issues.  *See Romberg Test*, Cleveland Clinic, *https*://my.clevelandclinic.org/ health/diagnostics/22901-romberg-test [https://perma.cc/VZ4G-GDU9] (last visited Sept. 19, 2025).

On January 5, 2021, Plaintiff reported no anxiety or depression.  (R. 735, 848.) Plaintiff was being seen with respect to his obesity, seeking to lose weight, but denied any acute concerns or complaints.  (R. 848.)

On February 4, 2021, Plaintiff sought the assistance of a dietician with respect to his obesity.  (R. 842-43.)

During an April 15, 2021 screening regarding problems with his sleep, Plaintiff denied a depressed mood, had anhedonia sometimes, denied hopelessness, denied anxiety, worry, and panic, and endorsed sleep disturbances and fatigue.  (R. 840, 1163.) Plaintiff's GAD-7 and PHQ-9 scores endorsed minimal symptoms of anxiety and mild symptoms of depression.  (R. 840-41.)  Plaintiff denied any psychotherapy.  (R. 841.)

On April 19, 2021, Plaintiff reported troubles with sleeping, but no gout problems nor any other problems.  (R. 728, 1158.)  His active problems included obesity, psoriasis, demographic urticaria, gout, hyperlipemia, and obstructive sleep apnea.  (R. 729.) Plaintiff's physical examination showed that he was not in any distress, his extremities were normal, and he was ambulatory.  (R. 731.)  The plan for Plaintiff was to take trazadone for his sleep and cut down on his alcohol so close to bed time.  (R. 731.) Plaintiff denied any gout flare-ups over the year and had managed the condition with diet. (R. 732.)

On September 28, 2021, Plaintiff reported that he was in Minnesota building a house.  (R. 1149.)

At a medical management follow-up visit on January 31, 2022, Plaintiff reported no gout flare-ups over the past few years.  (R. 776.)  Plaintiff's active problems included:

alcohol dependence; insomnia, obesity, psoriasis, dermographic urticaria, gout, hyperlipidemia, and obstructive sleep apnea. (R. 776.) Plaintiff's muscle strength was normal in his upper and lower extremities. (R. 779.) Plaintiff denied any anxiety or depression. (R. 778, 1138.) He also noted improvement with his sleep and no longer using trazadone because it made him dizzy and because he had been able to sleep without it. (R. 776, 1139.) Plaintiff was motivated to lose weight but refused the help of a dietician. (R. 781.) He also refused a statin for his high cholesterol, as he was "working out extensively." (R. 776.) Plaintiff reported that there was nothing in his life that was worrying him or causing him stress. (R. 813.) Plaintiff was attentive and had no barriers to learning. (R. 813.) Plaintiff's PHQ-2 screen for depression score was 0, which was negative for depression. (R. 813-14.) Plaintiff had no arthralgias, myalgias, or back pain; no numbness, weakness, or tingling; and had no anxiety or depression. (R. 815.) His examination showed that he was in no acute distress, he had a supple neck, and full strength in all his extremities. (R. 816.) Plaintiff represented that his gout had been properly managed for over 2 years with diet. (R. 817.)

On July 24, 2022, Plaintiff underwent a clinical interview to document his mental status for ongoing disability issues and to seek a second opinion on treatment options. (R. 803.) Plaintiff claimed that he worked in several industries, mostly as a project manager. (R. 803.) Plaintiff also asserted that he would often find himself in conflict, resulting in him quitting or being fired. (R. 803.) Plaintiff was high energy and people focused, but avoided long-term relationships. (R. 803.) Plaintiff noted that he assisted his father, but that his relationships with his brothers was stressful. (R. 803.) The mental

health examination for Plaintiff showed that he was alert and oriented, his affect was elevated, but appropriate to content of thought. (R. 803.) Plaintiff's speech was pressured. (R. 803.) Plaintiff was polite but he could take over a conversation; his thought content was goal oriented; he showed some fixation trying to solve problems; Plaintiff's IQ was good and EQ was adequate, but likely decreased. (R. 803.) Plaintiff had paranoid ideation, but not delusion. (R. 803.) Plaintiff claimed to be burned-out and hypervigilant. (R. 803.) Plaintiff denied ideation to harm others and passive suicidal ideation with no plan or history. (R. 803.) Dr. Brown opined that Plaintiff had major depression, moderate, chronic; generalized anxiety; and that his high energy was likely a combination of anxiety, PTSD, lifelong hypomania, and possible ADHD. (R. 804.) While Plaintiff asserted that he had taken a variety of psychiatric medications, he stopped all his medications, except for the occasional Ambien. (R. 804.) Dr. Brown further opined that Plaintiff was not capable of regular or sustained employment. (R. 804.)

On October 23, 2022, Plaintiff filled out a function report. Plaintiff claimed that his condition limited his social contact to avoid confrontation. (R. 329.) Plaintiff had no problems performing his personal care; he needed no reminders to take care of his grooming; he prepared his own meals; and he was able to clean, do laundry, take care of household repairs, and mow. (R. 330-31.) Plaintiff also represented that he went out daily and could drive. (R. 332.) Plaintiff could shop in stores and on computers to meet his daily needs. (R. 332.) He could pay his own bills and was otherwise able to handle money. (R. 332.) Plaintiff spent time with others daily, including in person, although he mostly kept to himself. (R. 333.) Plaintiff had problems getting along with family,

friends, neighbors, and others.  (R. 333.)  Plaintiff claimed he had very limited patience with people.  (R. 334.)  Plaintiff reported no problems with paying attention, that he finishes what he starts, he could follow written and spoken instructions, that he could get along with authority figures "fine"; that it was possible that he was fired or laid off because of problems getting along with others; that he could not handle stress; and that he could only handle changes in routine with difficulty.  (R. 334-35.)  Plaintiff claimed that he took no medications.  (R. 335.)

On November 16, 2022, Dr. Owi saw Plaintiff for a second SSA consultation.  (R. 1079.)  Plaintiff alleged disability due to sleep apnea, insomnia, and PTSD.  (R. 1079.) Plaintiff drove to the appointment.  (R. 1079.)  Plaintiff reported that he shopped, cooked, and cleaned and had no problem with sitting or standing, or walking.  (R. 1079.) Plaintiff's medications included: ophthalmic drops; Loratadine, which he was not taking; menthol cream; propranolol, Lidocaine cream; Clobetasol, and one 800-mg Advil every other day.  (R. 1079.)  Plaintiff claimed low back pain at the end of the day, neck pain at night, and tingling in the fingers intermittently.  (R. 1080.)  The examination of Plaintiff showed that he was not in any acute distress.  (R. 1080.)  There was no tenderness or spasm to palpation or discomfort with movement as to his spine.  (R. 1080.)  Seated and supine seated leg raises were negative.  (R. 1080.)  Upper extremities were normal.  (R. 693.)  Plaintiff's lower extremities were normal, without tenderness or discomfort with motion.  (R. 1080.)  There was mild crepitus with motion in the knees, but his limbs were otherwise normal. (R. 1080.)  Strength was normal to the extremities.  (R. 1080.)  Gait was normal without assistive device, he was able to do a one-legged stance with each leg,

Romberg test and tandem gait were normal, he was able to walk on heels and toes, and was able to get onto and off the exam table without assistance. (R. 1080.) Plaintiff's judgement and insight were good, his mood/affect exhibited full range, his speech was clear, he was unable to do serial 7 subtractions, but could spell a 5-letter word backwards. (R. 1080.) The assessment for Plaintiff was a history of combat related stress and history of sleep apnea and insomnia. (R. 1080.) Dr. Owi also found that Plaintiff had full range of motion of his cervical spine, lumbar spine, shoulders, elbows, wrists, hands, fingers and thumbs, hips, knees, ankles, and feet, except that the extension of his cervical spine was 50 degrees out of a range of 0-60 degrees and his hip flexion was limited to 95 out of 100. (R. 1076-78.) Plaintiff's straight leg raising was negative, he had had a normal gait, and his grip strength was normal. (R. 1078.)

In November 2022, state agency psychologist Nicole Mannis, PsyD, assessed Plaintiff based on the medical record. Dr. Mannis found that Plaintiff suffered from a severe sleep-related breathing disorder; and a severe musculoskeletal impairment, and non-severe mental impairments. (R. 76.) In her psychiatric review technique regarding Listings 12.04 and 12.08, Dr. Mannis asserted as part of the "B" criteria that Plaintiff had mild limitations of: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (R. 76.) On reconsideration in May 2023, state agency psychologist Michelle Butler, PsyD, offered the same opinions as Dr. Mannis. (R. 85-86.)

State agency doctor Minal Krishnamurthy, MD, found that Plaintiff had the physical RFC to occasionally lift and/or carry (including upward pulling) 50 pounds;

frequently lift and/or carry (including upward pulling) 25 pounds; and he could sit, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday.  (R. 77.)  Dr. Krishnamurthy further opined that Plaintiff had an unlimited ability to climb ramps /stairs, balance, kneel, crouch, and crawl; and that he could occasionally climb ladders, ropes and scaffolds.  (R. 78.)  In addition, Plaintiff had no manipulative, visual, or communicative limitations.  (R. 78.)  The only environmental limitation propounded for Plaintiff was that he was to avoid concentrated exposure to hazards (such as machinery or heights).  (R. 78.)  On reconsideration, state agency doctor Paul Sporn, MD, found similar limitations as Dr. Krishnamurthy for Plaintiff, except he could never climb ladders/ropes/scaffolds; and could only occasionally climb ramps/stairs, balance, kneeling, crouch, and crawl.  (R. 88.)  In addition, Dr. Sporn found that Plaintiff should avoid concentrated exposure to extreme heat and hazards.  (R. 88.)

On January 20, 2023, Plaintiff was seen for his mental health.  (R. 1128.)  Plaintiff reported working with a non-VA provider who diagnosed him with a traumatic brain injury ("TBI").  (R. 1128.)  Plaintiff claimed an improved ability to counteract his anxiety and anger.  (R. 1128.)  "[Plaintiff] also reported 'moving from place to place' for work as a consultant and for the non-profit he reports starting in France."  (R. 1128.) Plaintiff's attitude was mildly guarded but cooperative; dress was casual and appropriate; gait, posture, and eye contact were within normal limits; his speech was mildly elevated in rate, mildly elevated in volume, and somewhat circumstantial in productivity; his mood was dysphoric; his affect was full, anxious, but hopeful and congruent with mood; there was no evidence of disordered thinking when queried; Plaintiff denied homicidal

22

ideation; and his insight and judgment were fair. (R. 1129.) It was noted that Plaintiff had a sense of responsibility to his elderly father and adult son. (R. 1129.) Plaintiff was deemed a low risk to himself and others. (R. 1129.)

On March 15, 2023, Plaintiff had a counseling session with respect to his anger management. (R. 1123.) Plaintiff's attitude was mildly guarded but cooperative, his dress was appropriate, his gait, posture, and eye contact were normal; his speech was mildly elevated in rate, mildly elevated in volume, and somewhat circumstantial in productivity; his mood was dysphoric; his affect was full, anxious, but hopeful and congruent with mood; there was no evidence of disordered thinking and he denied any homicidal ideations. (R. 1123.) Plaintiff had a low acute and chronic risk of harm to himself and others. (R. 1123.) The assessment for Plaintiff was anxiety and anger, and he was referred to group therapy. (R. 1123.)

On March 23, 2023, Plaintiff reported feeling "pretty good' after taking a course of doxycycline, which helped with muscle fatigue and weakness, aching knees and ankles, joint cracking, and neck and head pain. (R. 1111.) Plaintiff also reported better sleep. (R. 1111.) Plaintiff endorsed intermittently bothersome left knee pain, which became worse with squats he started a month or two earlier. (R. 1111.) Plaintiff was not in any acute distress. (R. 1111.) The assessment was likely Lyme disease, with labs needed to confirm. (R. 1112.) Plaintiff's knee and ankle pain was likely due to gout. (R. 1112.) Plaintiff's screening for depression and PTSD were negative. (R. 1113-14.)

A March 29, 2023, x-ray of Plaintiff's left knee showed no evidence of fracture,

dislocation, or left knee joint effusion.  (R. 1348.)  There was minimal narrowing of the left lateral femorotibial joint compartment.  (R. 1348.)  The patellofemoral and medial femorotibial joint compartments were preserved, and the associated articular surfaces were smooth.  (R. 1348.)

On April 1, 2023, Plaintiff completed a second function report.  Plaintiff claimed an inability to sleep but noted that his CPAP machine helped considerably.  (R. 355.) Plaintiff complained of neck pain.  (R. 355.)  Plaintiff admitted to taking care of his 93-year-old father, primarily with cleaning.  (R. 356.)  His impairments' largest impact was on his sleep.  (R. 356.)  Plaintiff asserted that he needed no reminders to take his medications or to groom himself.  (R. 357.)  He also asserted that he prepared his own meals, performed all house and yard chores including cleaning, laundry, household repairs, ironing, and mowing.  (R. 357.)  He left his home daily, driving a car.  (R. 358.) Plaintiff also spent time with others in-person.  (R. 359.)  Plaintiff needed no reminders going to places.  (R. 359.)  Plaintiff claimed that he had problems with others, and over-reacted in many new social scenarios.  (R. 359.)  Plaintiff asserted that he did not have an issue with lifting, walking, stair climbing, understanding, squatting, sitting, following instructions, bending, kneeling, memory, using hands, standing, talking, completing tasks, and reaching.  (R. 360.)  Plaintiff claimed that he had issues with hearing, getting along with others, and concentrating.  (R. 360.)  Plaintiff was able to finish what he started.  (R. 360.)  He asserted that he had been fired or laid off because of his problem with getting along with others.  (R. 360.)

From approximately March 29, 2023 through April 13, 2023, Plaintiff participated in group anger management therapy.  (R. 1108-09, 1117-18, 1428.)  Plaintiff claimed a low level of anger.  (R. 1428.)

On May 2, 2023, Plaintiff represented that he had been exercising over the past few months, which included walking 3 miles/day and doing squats at the gym, up to 50 pounds.  (R. 1420.)  Plaintiff started experiencing pain in his left knee.  (R. 1420.) Plaintiff asserted that it was a sharp pain that was aggravated with squatting.  (R. 1420.) Plaintiff treated it with rest, ibuprofen, and heat.  (R. 1420.)  Plaintiff's activities included hunting and fishing.  (R. 1420.)  As for work, Plaintiff represented that he was on disability and building a farmhouse in Minnesota.  (R. 1420.)  Plaintiff noted that he had an apartment in Florida, but went between Minnesota and Wisconsin to stay with his father and son.  (R. 1420.)  Plaintiff was able to ambulate independently into the clinic and had no gait abnormalities.  (R. 1420.)  His knee appeared normal with no edema.  (R. 1420.)  The examination of Plaintiff revealed hip strength deficits, which appeared to have led to anterior knee irritability, including the patellar retinaculum/tendon.  (R. 1421.)  Plaintiff was given education on a proper squatting form and was provided with exercises to address hip strength and ankle range of motion for squatting.  (R. 1421.) Physical therapy was recommended.  (R. 1421.)

On August 25, 2023, Plaintiff represented to his medical provider that, "I am doing the best both physically and mentally that I have in a long time."  (R. 1413.)

Plaintiff was seen in the emergency room on September 10, 2023 for a gout flare-up in the right great toe.  (R. 1401.)  Patient described exercising vigorously prior to pain,

which involved doing several burpees.  (R. 1409.)  Plaintiff claimed a flare-up a year

earlier.  (R. 1409.)  The x-ray of the right foot showed no abnormalities.  (R. 1441.)

Plaintiff was prescribed with prednisone 40 mg for 7 days.  (R. 1401, 1409.)  On

September 11, 2023, he reported that he had complete resolution of the pain.  (R. 1401.)

Plaintiff was ordered to start allopurinol.[12]  (R. 1401.)  On September 27, 2023, Plaintiff

reported that his pain had returned, which was bothersome, but not enough to go to the

urgent clinic.  (R. 1401.)  Plaintiff's mood was good and he had a normal affect.  (R.

1401.)  Plaintiff was restarted on the prednisone. (R. 1401.)

On October 3, 2023, Plaintiff was seen for his concussive exposures while in the

army between 1993-2003.  (R. 1396, 1436.)  Plaintiff reported headaches, insomnia,

photophobia, irritability/anger, tinnitus, impaired memory, and impaired concentration.

(R. 1396.)  Plaintiff claimed vertigo, especially driving over bridges.  (R. 1397.)

Plaintiff's examination showed no psychomotor agitation, retardation, repetitive

movements, tremors or tics.  (R. 1398.)  Plaintiff was polite and fully engaged.  (R.

1398.)  His speech was normal, he showed a euthymic mood, and his affect was

congruent.  (R. 1398.)  Plaintiff was oriented and had normal thought process and

content.  (R. 1398.)  Plaintiff's Romberg test was negative.  (R. 1398.)  The assessment

for Plaintiff was likely a mild traumatic brain injury that occurred in 2003.  (R. 1398.)  It

was recommended that Plaintiff use over-the counter pain medication for any headaches;

---

[12]     Allopurinol, a xanthine oxidase inhibitor, is a urate-lowering medication that is
FDA approved for managing gout.  *See Allopurinol*, Nat'l Libr. Of Med.,
https://www.ncbi.nlm.nih.gov/books/ NBK499942/ [https://perma.cc/XVB9-5RHE] (last
visited Sept. 19, 2025).

vitamin and mineral supplements, self-acupressure, and to monitor. (R. 1399.) Plaintiff was also told to decrease his alcohol intake. (R. 1399.)

On October 4, 2023, Plaintiff requested a refill of prednisone for his gout flare, which had provided him with good improvement. (R. 1395.) He continued to have mild inflammation of the right great toe and sought a few more prednisone tablets to have on hand. (R. 1395.) He was hesitant to restart allopurinol, despite being advised to do so by medical providers. (R. 1395.) Plaintiff's examination showed that his mannerisms and interactions were appropriate, his speech was normal, his mood was good; he had a normal affect; and he was cooperative. (R. 1395.)

On January 20, 2024, Plaintiff presented to the emergency room with a complaint of chronic neck pain that had recently worsened. (R. 1384.) Plaintiff requested doxycycline for his chronic flare-ups of Lyme disease, specifically oral antibiotics as prophylactic treatment, claiming that he had always been treated this way for his flare-ups. (R. 1384, 1387.) Plaintiff was angry, demanding a prescription for Lyme disease. (R. 1388.) Plaintiff yelled expletives at the doctor for not initially giving him doxycycline for his chronic neck pain and stormed out. (R. 1388.) Plaintiff also sought Toradol. (R. 1388.) Plaintiff was ultimately prescribed with a 7-day dosage of Doxycycline. (R. 1384.) Plaintiff had no pain at discharge. (R. 1382.)

On January 29, 2024, Plaintiff had a follow-up discussion with his provider as to whether chronic Lyme disease or gout was the cause of his pain, and he agreed to start allopurinol given that his previous symptoms had resolved. (R. 1381.)

On February 19, 2024, Plaintiff's retained expert, Emily Tiderington, BSN, RN, provided her opinion regarding Plaintiff's physical and mental restrictions based on a review of the medical record. (R. 1452-1502.) As part of her physical medical source statement, Tiderington listed Plaintiff's symptoms as fatigue, irritability and insomnia. (R. 1452.) In addition, she concluded that Plaintiff was in chronic pain that was anywhere from a 2-7 out of 10 rating in his neck. (R. 1452.) When characterizing his pain, she wrote that "[w]hen his right foot flares with gout he has moderate pain that impairs his walking." (R. 1452.) She further wrote that both his knees were painful; his ankle bothered him; and he had an impaired ability to run. (R. 1452.) Plaintiff's depression, anxiety, and PTSD also affected Plaintiff's condition. (R. 1453.) Tiderington opined that Plaintiff could walk 1-2 miles without rest, sit 2 hours before needing to get up, and could stand for 2 hours at a time; he could sit or stand/walk for about 4 hours out of an 8 hour work day; he would need to walk every 90 minutes for 10 minutes at a time; he would need intermittently unscheduled work breaks during a work day due to chronic fatigue, pain, and irritability/anxiety; he could walk and stand without a hand held device; he could frequently carry 10 pounds or less, could occasionally carry 20 pounds; and could rarely carry 50 pounds; he could rarely twist, stoop, crouch, climb stairs or ladders; and he had no limitations with respect to reaching, handling, or fingering. (R. 1453-54.) Tiderington opined that Plaintiff would be off task about 20% of the workday. (R. 1455.) Tiderington also opined that Plaintiff was incapable of even low stress work and would likely be absent from work each month due to his conditions. (R. 1455.)

In her mental impairment questionnaire, Tiderington, based on the medical record, opined that Plaintiff had the diagnoses of anxiety, PTSD, intermittent explosive disorder, irritability, and panic disorder. (R. 1467.) She further opined that Plaintiff had a mild limitation with respect to understanding information, remembering information, applying information; moderate limitation as to concentrating, persisting, and maintaining pace; and extreme limitations with respect to interacting with others and adapting in the workplace. (R. 1470.) Tiderington believed that Plaintiff's impairment would cause him to miss more than four days per month. (R. 1471.) She also found that Plaintiff met the Listings for 12.04, 12.06, 12.08 and 12.15. (R. 1472-1483.) As to the "B" criteria of the Listings, Tiderington found that Plaintiff had a moderate limitation as to adapting or managing himself; a marked limitation as to understanding, remembering, or applying information and concentrating, persisting or maintaining pace; and an extreme limitation as to interacting with others. (R. 1484.)

During the hearing before the ALJ, Plaintiff testified that he is afraid of heights and would not drive over steep bridges. (R. 41.) Plaintiff also testified that he lost his last job in 2019 because the employer had lost their largest client and underwent a reduction of force, although he claimed it was pretext for a firing. (R. 45.) Plaintiff asserted that in one of his previous jobs he was accommodated with a flexible schedule, although it is unclear from the record if this pertained to his last employment in 2019. (R. 48.) Plaintiff claimed no angry confrontations at work. (R. 60-61.) Plaintiff continued to do occasional short-term projects, for which he was not asked back because he had a pipe in a tent and people thought he was smoking in an enclosed space. (R. 46.)

Plaintiff also claimed taking doxycycline "every nine months to a year," which helped the pressure in his head and the strength in his muscles. (R. 50.) Plaintiff also took over-the-counter medications to treat the pressure. (R. 52.) Plaintiff testified that he had social interactions with his neighbors, and got along with them, although he asserted that he had known the families his whole life. (R. 55.) He also claimed that he experienced two situations in his life when he lost control in interacting with others (including a time he was hit in the groin by another), but did not specify when these events occurred. (R. 58-59.) Plaintiff took no medication except for an allergy medication and over-the-counter pain medications. (R. 58.) Plaintiff was not taking his gout medication because he had only experienced three outbreaks of gout over a period of two years. (R. 58.)

### III.    LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018). As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102-03(2019) (citation modified).

"This court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (citation modified). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

## IV.    DISCUSSION

### A.    Whether the ALJ Properly Determined that Plaintiff did not meet the Listings Under 12.00

Plaintiff argues that he meets the following Listings: 12.04 for depression, 12.06 for anxiety, 12.08 for personality and impulse disorders, and 12.15 for trauma. (Dkt. 6 at 11-12.) The ALJ considered the Listings as to 12.04 and 12.08. (R. 18.)

The Commissioner's regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Such conditions are described in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1. Plaintiff has the burden of proof to establish that his impairment meets or equals a listing. *See Schmitt v. Kijakazi*, 27 F.4th 1353, 1358-59 (8th Cir. 2022); *see also Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing *Sullivan v. Zebley*,

493 U.S. 521, 530-31 (1990)).  A claimant must point to specific evidence to establish that she meets each requirement of the listing.  *See Sullivan*, 493 U.S. at 530.  "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing.  'An impairment that manifests only some of the listing criteria, no matter how severely, does not qualify.'"  *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (citation modified) (quoting *Sullivan*, 493 U.S. at 530).

Listing 12.00 recognizes 11 types of mental disorders that can constitute a disability for purposes of social security benefits.  20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(A)(1).  Listings 12.04, 12.06, and 12.15 each have three subparagraphs: A, B, and C.  *Id*. at (A)(2).  Listing 12.08 has two subparagraphs, designated A and B.  (*Id.*)  Paragraph A lays out the medical criteria that the claimant must present in his medical evidence, requiring "objective medical evidence from an acceptable medical source to establish that [a claimant has] a medically determinable mental disorder."  *Id.* at (A)(2)(a), (C)(1).  Plaintiff takes issue with respect to what he contends is a cursory and one-sided analysis of the mental health Listings with respect to the B criteria by the ALJ.  (Dkt. 6 at 12.)

Paragraph B lists areas of mental functioning used in a work setting in order to assess the claimant's functioning.  20 C.F.R. pt. 404, subpt. P, app. 1(12.00)(A)(2)(b), (E).  The four areas of functioning are: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.  *Id.* at (E)(1)-(4).  The Listings use a five-point rating system to define a

claimant's functioning in these four areas: no limitation; mild limitation; moderate limitation; marked limitation; and extreme limitation. *Id.* at (F)(2)(a)-(e). A moderate limitation is defined as: "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." *Id.* at (F)(2)(c). A marked limitation is defined as: "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.* at (F)(2)(d). And an extreme limitation is defined as: "You are not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.* at (F)(2)(e). To satisfy Paragraph B, the claimant's mental disorder must result in either an extreme limitation in one of the four areas or a marked limitation in two of the four. *Id.* at (F)(2). As set forth above, it is the claimant's burden to prove they are disabled. *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992); *see also Cronin v. Saul*, 945 F.3d 1062, 1066 (8th Cir. 2019) (noting that the claimant "bears the burden at step three of showing that his impairments meet or equal an impairment described in the listings"). The Court will proceed with its review of the ALJ's decision as it relates to the four areas of functioning under Paragraph B of the Listings.

### 1.    Plaintiff's Ability to Understand, Remember, or Apply Information and his Ability to Concentrate, Persist, or Maintain Pace

With respect to Plaintiff's ability to understand, remember, or apply information, and his ability to concentrate, persist or maintain pace, the ALJ found that Plaintiff had mild limitations for the following reasons:

> The claimant notes in his function report that he does not need special reminders for personal needs and grooming nor reminders to take

33

medications (Ex. 14E). The claimant more often than not endorsed no memory issues in the medical record (Ex. 10F/36/56, 17F/65). The objective findings also reveal that the claimant had normal memory and fund of knowledge (Ex. 10F/53/92).

\* \* \*

The claimant noted no issue with his ability to concentrate in his function report (Ex. 8E, 14E). He states that he can follow written and spoken instructions "fine" (Ex. 8E) and that he can finish things that he starts (Ex. 14E). In the medical record, the claimant at times noted poor concentration or distractibility (Ex. 17F/23/24/65). However, objective examinations showed that his concentration and attention were normal (Ex. 10F/86/96).

(R. 19-20.)

Plaintiff argues that while the ALJ reasoned that Plaintiff does not need reminders for grooming or to take medications, he filled out two capacity reports reporting different symptoms on each report. (Dkt. 6 at 12-13.) Plaintiff also asserts that the ALJ did not refute his contention that he worked in an accommodated capacity, his self-reported opinion that he can keep track of medications is questionable given the record, and the reasons why he did not need reminders for grooming was because he slept so much and lived far from others. (Id. at 13.) The Commissioner counters, in part, that Plaintiff has only pointed out an alternative interpretation of the evidence and asked the Court to reweigh the evidence in his favor, which is not allowed, even if it would have decided the case differently. (Dkt. 13 at 10.) Plaintiff responds that he is not requesting that the Court reweigh the evidence, only that the ALJ provide a plausible written explanation for her unsupported findings. (Dkt. 14 at 4.)

The medical evidence in the record repeatedly supports that Plaintiff's ability to understand information, concentrate, as well as maintain attention, was normal, and that

his memory was fully intact. (*See*, *e.g.,* R. 413-14, 497, 704-05, 795, 857, 896, 1080.)

In addition, his insight as to understanding his own health was also adequate. (*See*, *e.g.*,

R. 415, 497, 527, 680, 704-05, 795, 1080, 1129.) Moreover, Plaintiff's own function

reports support the ALJ's findings. He attested that he needed no reminders for taking

his medications or grooming. (R. 331, 357.) He also admitted that he could follow

written and spoken instructions. (R. 334.) In addition, Plaintiff said that he needed no

reminders going to places. (R. 359.) Plaintiff further represented that he was able to

finish what he started—that is, persist—and, in one of his function reports, represented

that he had no issues with his memory. (R. 360.) While Plaintiff invites the Court to

draw different interpretations and conclusions from the evidence, the Court finds that

ALJ's decision as to Plaintiff's ability to understand, remember, or apply information

and concentrate is "supported by substantial evidence in the administrative record, and

[Plaintiff]'s contentions that the ALJ should have weighed these facts differently or

drawn different conclusions do not warrant relief under [the applicable] deferential

standard of review." *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016).

## 2.    Plaintiff's Ability to Interact with Others

With respect to Plaintiff's ability to interact with others, the ALJ found that

Plaintiff had a moderate limitation based on the following:

> The claimant reported in his function report, noting that he can spend time
> with others in person and electronically (Ex. 14E). He does not need to be
> accompanied to go out in public, but he states that he can overreact in new
> social scenarios. He states that he spends most of his time by himself. In the
> medical record, the claimant presented as anxious on a few occasions with a
> congruent mood (Ex. 10F/57/105, 17F/23). Otherwise, the claimant's

> providers noted that he was cooperative and pleasant (Ex. 10F/53/92/109/145, 17F/27/64).

(R. 19.)  Plaintiff contends that the ALJ improperly took one of the two function reports out of context to say that he can get along with others, despite an alleged poor relationship with his son, his claims of physical assaults, that he never married, and that he requires isolation.  (Dkt. 6 at 13.)  The Commissioner argues that substantial evidence supports the ALJ's assessment of a moderate limitation to Plaintiff's ability to interact with others.  (Dkt. 13 at 10.)  The Commissioner asserts Plaintiff's arguments are more suited for a challenge of the RFC determination, amount to propounding an alternative interpretation of the evidence, and ask the Court to reweigh the evidence in his favor. (*Id.*)

The Court acknowledges that Plaintiff has asserted that he was involved in two fights where he lost his temper, one of which (the motorcycle incident in either 2015, 2018, or 2019) is referenced in the medical record (R. 362, 413, 494, 1479) and the other of which was a response to a person hitting Plaintiff in the testicles with a pool cue, apparently in 2022 (R. 59-60, 362).  However, the record varies as to when the motorcycle event occurred in relation to the disability onset date, and the 2022 event was in response to someone hitting Plaintiff in the testicles with a pool cue, which is someone different from dealing with work-related stress.  The objective medical evidence in the record supports a largely normal mood with no depression, anxiety, or PTSD, and Plaintiff was almost always cooperative and pleasant (outside of one incident in January 2024 where he yelled expletives at a doctor for not providing him a medication), and he

repeatedly denied ideation of harming others.  (*See*, *e.g.*, R. 408, 653-54, 693, 803, 813, 840-41, 957, 1113-14, 1129, 1134, 1138, 1198, 1388, 1395, 1398, 1401.)  Moreover, in his own function reports Plaintiff represented that he spent time with others daily, including in person, and that he got along with authority figures.  (R. 333-34.)  While Plaintiff asserted that the ALJ took one of the function reports out of context, arguing that Plaintiff had a poor relationship even with his son, this ignores his admissions at the hearing before the ALJ that he never had any angry confrontations at work, and that he has social interactions with his neighbors.  (R. 55, 60-61.)  Moreover, the record contains Plaintiff's admissions that he had a close relationship with his son, in contrast to his relationship with his brothers and father (R. 685), he had a sense of responsibility to his elderly father and adult son (R. 1129), and he travelled between Minnesota and Wisconsin to stay with his father and son, and took care of his elderly father (R. 1420). While Plaintiff may have preferred being in isolation, substantial evidence in the record as a whole supports the ALJ's finding that he only had a moderate limitation as to his ability to interact with others.

### 3.    Plaintiff's Ability to Adapt or Manage Himself

As to Plaintiff's ability to adapt or manage himself, the ALJ found that Plaintiff had a moderate limitation based on the following:

> The claimant notes no issues with personal cares in his function report (Ex. 14E). He states that he helps his father with cleaning, who is 93 years old. He is able to make meals for himself. He does yard work, household chores, laundry, and cleaning. He is able to get around daily and drive a car. However, he notes that he has sleep issues, and feels that he is not getting enough restful sleep. He notes that he also has anger issues, and it is difficult for him to interact with others on occasion to controlling this behavior (Ex.

10F/53). The medical record otherwise showed no issues with dress or grooming (Ex. 17F/24).

(R. 20.) Plaintiff relies, in part, on his assertions that he has assaulted individuals and his self-reported problems with controlling his emotions while working to support his argument that the ALJ should have a found a marked or extreme limitation in this area of functioning. (Dkt. 6 at 13-14.)

Under the regulations, being to adapt or manage oneself refers to:

[T]he abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(E)(4).

The ALJ is correct that Plaintiff asserted that he was able to take care of his grooming, and there is nothing in the medical record that contradicts this finding. Moreover, Plaintiff's assertion of problems at work (Dkt. 6 at 14) are not borne out by the record, as he admitted that he was released from his last job due to a reduction in force. (R. 45.) While, he claims it this served as a good excuse for his employer to get rid of him (R. 45), his claims of not being able to control himself is contradicted by his admissions at the hearing before the ALJ that he never had any angry confrontations at work (R. 60-61), and his report to a medical provider in October 2019 that he "met w/ former boss from United Health Group" and felt like "this went well, and the former boss will be helping to see if he can get a job in Tampa." (R. 488.) His former boss's

willingness to help Plaintiff find a new job undermines Plaintiff's argument that he could not control himself at work. All his evidence, coupled with evidence set for in Section IV.A.2, *supra*, amounts to substantial evidence that Plaintiff did not have a marked or extreme limitation in the area of adapting or managing himself. Plaintiff argues the ALJ's recitation of his daily activities lacks nuance and context, especially given his military background and that his work was with "military related employers where veterans understand each other's circumstances." (Dkt. 6 at 14.) This is not entirely correct, as Plaintiff's work included work at various health care companies. (R. 43-44.) Plaintiff also speculates based on the hearing transcript that the ALJ was "likely" concerned that Plaintiff would have an outburst during the hearing because she "felt the need to imply to [Plaintiff] (who was represented by counsel and understood the hearing procedure) that the first hypothetical to the vocational expert would not be favorable to him." (Dkt. 6 at 13.) Plaintiff's citation to page 63 of the record (page 68 of the CM/ECF pagination) does not support this assertion. Earlier in the hearing, the ALJ did tell Plaintiff as to the hypotheticals: "I always offer more than one, [Mr. R.,] and I kind of start something [sic] that is pretty expansive and then I have an additional limitations [sic] as we go along." (R. 63.) Nothing about this explanation of the hypothetical process suggests that the ALJ was concerned about an outburst from Plaintiff. Plaintiff's unsupported and speculative argument as to the ALJ's motivation is merely again an invitation to the Court to draw different inferences than the ALJ did based on the evidence, which is not allowed. *See Nash*, 907 F.3d at 1089.

Further, it appears that Plaintiff is taking the position that his daily activities are not evidence of an ability to adapt and manage himself on a consistent and regular basis. (Dkt. 6 at 14.)  This argument is contrary to the law, as the Eighth Circuit has found that daily activities may be considered in analyzing the Paragraph B criteria.  *See Twyford v. Comm'r, Soc. Sec. Admin.*, 929 F.3d 512, 517 (8th Cir. 2019).

Plaintiff's reliance on his expert Tiderington's opinions (Dkt.  6 at 11-12) does not change the analysis.  The regulations set forth how an ALJ should determine the weight assigned to each medical opinion.  *See* 20 C.F.R. § 404.1520c(a).  For claims filed after 2017: "[An ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  When a medical source provides one or more medical opinions or prior administrative medical findings, the ALJ will consider those medical opinions or prior administrative medical findings from that medical source together using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant (including length and purpose of treatment and frequency of examinations, among other factors), (4) specialization, and (5) other factors (for example, when a medical source has familiarity with the other evidence in the claim).  20 C.F.R. § 404.1520c(a), (c)(1)-(5).

The regulation further states:

The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors

> for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. § 404.1520c(b)(2).

> The regulation describes supportability and consistency as follows:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2).

"Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5,844-01, 5,853, 2017 WL 168819 (Jan. 18, 2017); *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5,844-01, 5,853; *see also* 20 C.F.R. § 404.1520c(c)(2). An "ALJ's discussion of [a medical source's] treatment and examination notes reflects the ALJ's consideration of the supportability factor with respect to their opinions." *Stephanie B. v. Kijakazi*, No. CV 22-837 (JWB/DTS), 2023 WL 3394594, at *1 (D. Minn. May 11, 2023). An ALJ's discussion of

41

the record when discussing consistency similarly shows consideration of that factor. *See Troy L. M. v. Kijakazi*, No. 21-CV-199 (TNL), 2022 WL 4540107, at *11 (D. Minn. Sept. 28, 2022) (discussing supportability and consistency and explaining "the ALJ's conclusion regarding the consistency factor—like the supportability factor—must be read in the context of the decision in its entirety").

Tiderington found that Plaintiff suffered from major depressive disorder, anxiety, and PTSD based on his reports to medical providers of depression, anxiety, hyperarousal and hyperresponsiveness, angry outbursts, his treatment of his depression with alcohol, and the use of Ambien for sleep. (R. 1475, 1477, 1483.) Tiderington also found that Plaintiff suffered from Intermittent Explosive Disorder, given his reports for throwing objects against the wall, and incident where he ripped a man who gave him an obscene gesture off a motorcycle and hit him repeatedly, which Plaintiff told Tiderington occurred in 2015, and his involvement in counseling for his anger. (R. 1479.) As to the "B" criteria of the listings, Tiderington found that a moderate limitation as to adapting or managing himself; a marked limitation as to understanding, remembering, or applying information and concentrating, persisting or maintaining pace; and an extreme limitation as to interacting with others. (R. 1484.)

The ALJ addressed Tiderington's opinions as to Plaintiff's mental restrictions as follows:

> As for mental opinions, Ms. Tiderington opines that the claimant has extreme limits in interacting with others, extreme limits in adapting in a workplace, and extreme limits in managing oneself in the workplace (Ex. 19F). She opines that he would be absent from work more than four days per month. She also opines that the claimant meets listings 12.04, 12.06, 12.08, and

12.15 (Ex. 20F). In making this opinion, she notes that the claimant has a marked limitation in understanding, remembering, or applying information, an extreme limitation in interacting with others, a marked limitation in concentration, persistence, or pace, and a moderate limitation in adapting or managing oneself. These opinions are unpersuasive. In support, she notes that the claimant has a known history of aggression, irritability, and anger from trying to readapt to civilian life after being in the Army for 30 years. He has bilateral hearing loss from explosions he was involved in overseas. The claimant has anger outbursts and he has admitted to throwing objects against the wall. He has been actively involved in counseling and anger management to assist him with his impulse control. Common triggers of his anger include being disrespected by others. He is hypervigilant, hyper responsible, and hyperresponsive. He scans parking lots, cars, and rooftops. He gave an example of hyperresponsiveness when he was with his son he overreacted to a sudden, loud trains.

This is inconsistent with other evidence in the record. The claimant underwent anger management, which seemed to provide positive benefit (Ex. 16F/22). During therapy sessions, he actively engaged in discussions and acquired strategies to manage his anger (Ex. 16F/17). The claimant consistently attended mental health appointments and followed recommendations to decrease alcohol consumption (Ex. 16F/25). Additionally, the claimant was advised to take medications, but it seemed he declined. Otherwise, the claimant had a mental status, which indicated that he displayed politeness, cooperation, attentiveness, appropriate eye contact, normal speech, and a euthymic mood. Indeed, the record continually showed that the claimant had normal memory, normal concentration, and attention, and was able to take care of his activities of daily living. Moreover, despite reports of anxiety, the claimant has been routinely able to interact with providers appropriately where he was cooperative and pleasant (Ex. 14E, 10F/53/86/92/96/109/145, 17F/27/64).

(R. 25.)

Notwithstanding Tiderington's opinions that Plaintiff suffered from severely restricted mental functioning, the ALJ properly found that her opinion was inconsistent with the record, in part, because of Plaintiff's conservative course of treatment. *See Pierce v. Kijakazi*, 22 F.4th 769, 773 (8th Cir. 2022) (affirming ALJ's rejection of treating physician's opinion in light of plaintiff's relatively conservative course of

treatment); *Perkins v. Astrue*, 648 F.3d 892, 898-99 (8th Cir. 2011) (holding that an ALJ properly discounted a treating physician's opinion in part because the treating physician's opinion was inconsistent with the conservative nature of the treatment rendered).  The record shows that Plaintiff was hesitant to take medication, and despite being prescribed medication for his claimed inability to deal with his anger, he reported not taking the medication, and even represented that he was uncertain that he had gotten to the point where he felt that these medications were necessary.  (R. 412, 415, 488, 498.)  Plaintiff's failure to take medication prescribed for his anger issues undermines his claims of disability.  *See* 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . .").  In his brief, Plaintiff argues that he tried "various medications to manage his mental health with no significant improvement" (Dkt. 6 at 14), but in February 2022, he reported stopping psychiatric medications because he did "not like being dependent"; as of October 2022, he reported that he was not taking any medications; as of the time of the hearing, he was not taking any psychiatric medications.  (R. 58, 336, 804.)  Plaintiff cites nothing in the medical record that supports his assertion that he stopped taking medication to treat his anger issues because it was ineffective.  Based on Plaintiff's conservative treatment, failure to follow prescribed treatment, and the Court's analysis set forth in Section IV.A.1-3 of this Order, *supra*, with respect to evidence in the record that is inconsistent with Tiderington's opinions as to Plaintiff's mental capacity to function, the Court finds that the ALJ's decision to discount Tiderington's opinions as to the Listings and the mental RFC is supported by substantial evidence.

* * *

In sum, regardless of whether there is evidence to the contrary, for all of the reasons stated above, the Court finds that the ALJ's decision that Plaintiff did not satisfy the Paragraph B criteria of the Listings is supported by substantial evidence.

**B.    RFC**

An RFC is a measurement is based on a claimant's ability to do "sustained work-related physical and mental activities in a work setting on a regular and continuing basis," meaning 8 hours a day for five days a week or an equivalent schedule.  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  It is intended to quantify the "most" a claimant "can still do despite [their] limitations." *Id.* at *2, 4; 20 C.F.R. § 416.945.  An RFC is an "administrative assessment," not a medical assessment, despite drawing on medical sources.  *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016) (citation modified); *see also Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007)).  "It is not the diagnosis that becomes part of the RFC, instead the RFC describes a Plaintiff's capabilities and limitations as a result of medical conditions."  *Long M. v. Berryhill*, No. 18-CV-862 (ECW), 2019 WL 2163384, at *7 (D. Minn. May 17, 2019) (citation modified).  Indeed, the fact "[t]hat a claimant has medically-documented impairments does not perforce result in a finding of disability."  *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004) (citing *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996)).

A disability claimant has the burden to establish his RFC.  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (*citing Masterson v. Barnhart*, 363 F.3d 731,

737 (8th Cir. 2004)).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)) (citation modified).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley*, 829 F.3d at 932 (citing *Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013); *Perks*, 687 F.3d at 1092-93).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  *Id.* (quoting *Myers*, 721 F.3d at 527) (citation modified).  However, "statements about [a claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled."  20 C.F.R. § 416.929(a).

Plaintiff asserts three primary errors on the part of the ALJ with respect to his RFC involving: his postural limitations, social limitations, and the ALJ's consideration of his subjective symptoms.  The Court addresses these in turn.

### 1.    Postural Limitations

First, Plaintiff takes issue with ALJ's RFC explanation for finding that Plaintiff can frequently balance, stoop, kneel, crouch, and crawl.  (Dkt. 6 at 14-15.)  Plaintiff points to the ALJ's reliance on Dr. Sporn, who found that Plaintiff is limited to occasional climbing ramps, stairs, ladders, ropes, and scaffolds, but criticizes the ALJ for not adopting Dr. Sporn's finding that Plaintiff could only occasionally balance, stoop,

kneel, crouch, and crawl.  (Dkt. 6 at 15.)  Plaintiff argues that the ALJ gave Dr. Sporn's

opinion persuasive weight but only adopted the limitations that led to a not disabled

finding.  (*Id.*)  Plaintiff goes on to argue that this is not a harmless error as two of the

three jobs identified require frequent stooping, "[which] leaves one occupation, which

does not satisfy Social Security's step-five burden of proof."  (*Id.*; *see also* Dkt. 14 at 5.)

According to Plaintiff, the ALJ also failed to explain how she resolved the discrepancies

between the agency doctors.  (Dkt. 6 at 15.)

     The Commissioner responds that the ALJ was not required to include verbatim

every limitation expressed by the reviewing provider.  (Dkt. 13 at 12.)  The

Commissioner further argues that even if the ALJ erred as to stooping, the Dictionary of

Occupational Titles ("DOT") describes the laboratory equipment cleaner position "as

involving no greater than occasional postural activities" and consisting of 25,000 jobs in

the national economy.  (*Id.* at 12-13.)  According to the Commissioner, this is more than

enough to qualify as a significant number of jobs in the national economy.  (*Id.* at 13.)

     With respect to being able to climb ramps, stairs, ladders, ropes, and scaffolds, the

ALJ found that Plaintiff could "frequently stoop, kneel, crouch, and crawl."  (R. 26.)  The

basis for this finding was as follows:

> The state agency medical consultants opined that the claimant could
> occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25
> pounds (Ex. 2A, 4A). They opined that standing and/or walking and sitting
> were both limited to 6 hours in an 8-hour workday. **Postural limits were
> limited to occasional, with exception of climbing ladders, ropes, or
> scaffolds, which was never. These opinions are persuasive**. In support, the
> state agency indicates that the claimant has a history of obesity but has
> otherwise had normal gait and normal strength. This is consistent with other
> evidence noting that the claimant has been able to maintain activities of daily

living, including cooking, household chores, and yardwork. He noted that he
was working out quite regularly (Ex. 10F/10).

(R. 24 (emphasis added).)

The state agency consultants provided different opinions with respect to Plaintiff's

ability to stoop, kneel, crouch, and crawl.  Dr. Krishnamurthy opined that Plaintiff had an

unlimited as to his ability to kneel, crouch, and crawl, while Dr. Sporn found on

reconsideration that Plaintiff could occasionally kneel, crouch, and crawl.  (*Compare* R.

78, *with* R. 88.)  The Commissioner has consistently defined "frequent" as activity that

exists from one-third up to two-thirds of the time.  *See generally*, SSR 83-10, 1983 WL

31251, at *4 (Jan. 1, 1983); SSR 85-15, 1985 WL 56857 at *7 (Jan. 1, 1985).  On the

other hand, the Commissioner has consistently defined "occasional" as activity occurring

from very little up to one-third of the time.  *See, e.g.*, SSR 83-10, 1983 WL 31251, at *4

(Jan. 1, 1983); SSR 85-15, 1985 WL 56857 at *7 (Jan. 1, 1985); SSR 96-9p, 1996 WL

374185, at *3 (July 2, 1996).  The Commissioner is correct that ALJ "was not required to

adopt the exact limitations set forth in the opinions she found partially persuasive."

*McKinney v. O'Malley*, No. 23-3220, 2024 WL 1327965, at *1 (8th Cir. Mar. 28, 2024);

*see also Wyatt v. Kijakazi*, No. 23-1559, 2023 WL 6629761, at *1 (8th Cir. Oct. 12,

2023) ("The ALJ was not required to adopt the exact limitations set forth in the opinions

she found persuasive, and substantial evidence supported the RFC findings regarding

Wyatt's abilities to interact with others in the workplace.").  That said, an ALJ "must also

explain how any material inconsistencies or ambiguities in the evidence in the case

record were considered and resolved."  *Catrina W.*, No. 23-CV-2975 (JMB/DJF), 2024

WL 5494521, at *3 (D. Minn. Oct. 31, 2024) (quoting SSR 96-8p, 1996 WL 374184, at *7).  Here, the ALJ failed to explain why she adopted a limitation that Plaintiff could frequently stoop, kneel, crouch, and crawl when she found persuasive two opinions that set forth different abilities as to these postural limitations, one finding an unlimited ability and one that limited Plaintiff to occasional.  (R. 24, 26, 78, 88.)

Regardless, an error at step four should not be remanded if that error was harmless.  *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008).  Plaintiff does not assert that his ability to stoop, kneel, crouch, and crawl was less than occasional.  (*See* Dkt. 6 at 15.)  Plaintiff also does not dispute the ALJ's conclusion that one of the positions propounded by the VE, Lab Equipment Cleaner, DOT# 381.687-022, unskilled, SVP 2, medium, consists of approximately 25,000 jobs in the national economy.  (R. 27.) As set forth in below, *infra* Section IV.C, the laboratory equipment cleaner job involves no greater than occasional postural limitations.[13]  *See* 381.687-022 Cleaner, Laboratory Equipment, DICOT 381.687-022.  As such, the Court finds no basis to remand even if the RFC should have included an occasional limitation as to these postural activities.

---

[13]    Plaintiff also argues: "Medium work probably requires frequent stooping regardless of what the cleaner of laboratory equipment states on Job Browser Pro."  (Dkt. 6 at 15.)  It is unclear what Plaintiff means by this argument, as he also concedes that there is "one occupation" left (*see id.*).  The Court does not address Plaintiff's argument regarding medium work and stooping further, as the DOT describes the laboratory equipment cleaner position as requiring no greater than occasional postural activities and Plaintiff has provided no evidence or reasoned explanation by the DOT cannot be relied on for this conclusion.

## 2. Social Limitations

Plaintiff argues that ALJ's finding that he can tolerate occasional non-collaborative interactions with co-workers and incidental contact with the public is unsupported by the record.  (Dkt. 6 at 18-19.)  Plaintiff points to his own admissions of past assault, that he refused to work in public, and that he drank to self-medicate.  (*Id.*)  Plaintiff also relies upon the opinions of his expert Tiderington and the VA rating decision.  (*Id*. at 18.)  The ALJ assigned Plaintiff with the following RFC as to social interactions:

> The claimant can tolerate occasional, cursory, non-collaborative interactions with co-workers, but is not able to engage in work that is in tandem or interdependent with co-workers. He is limited to only incidental contact with the public, meaning he could work in proximity to the public, but should have no responsibility for serving the public directly.

(R. 21.)  The ALJ's reasoning for this limitation was as follows:

> As to his mental health impairments, the record indicates that the claimant underwent an initial assessment with psychology on August 12, 2020, as a referral from another provider (Ex. 8F/82). At that assessment, the claimant reported that he "can work himself up into a rage," and he alleged anger management issues, with a reported history of "losing control" in his past and problems managing his anger around his adult son, 2 brothers, and his father (Ex. 8F/83). The claimant described symptoms consistent with depression, but denied mania, anxiety, panic, and social anxiety. He had previously been diagnosed with PTSD due to his military experience around September of 2019, and he reported varied alcohol use on a daily basis (Ex. 8F/85).

> The record notes that the claimant was often drinking 6-7 shots of vodka a day, and he alleged that this was in part to help him fall asleep at night (Ex. 10F/134). Even so, he was able to continue to function in his activities of daily living and there were points in which he noted no PTSD symptoms (Ex. 10F/127/134). These anger issues were continually noted in the record, but the claimant also notes drinking each night (Ex. 10F/109/110/114). The claimant was also not interested in starting Lexapro and propranolol, despite recommendations from his providers (Ex. 16F/112).

> In January of 2022, the claimant reported doing well that he was having no worries or stress (Ex. 10F/9). On a depression screening, the claimant noted no issues (Ex. 16F/35). This was consistent with a mental status examination, which showed that he was alert, cooperative, speech was normal, he had good eye contact, but he was tearful, and his thought process was linear (Ex. 10F/110).
>
> The claimant would also accept a referral to anger management, and he appeared to do well with this (Ex. 16F/22). In therapy, the claimant actively participated in discussions, and learned coping mechanisms for anger (Ex. 16F/17). The claimant continued mental health treatment and appeared to comply with suggestions to reduce his alcohol intake (Ex. 16F/25). He was also recommended propranolol and medication to help with alcohol cravings. A mental status examination showed that he was polite and cooperative, fully engaged, made appropriate eye contact, speech was normal, and mood was euthymic.

(R. 23.)

Plaintiff relies on his two past assaults. The first is when Plaintiff reports pulling a person off a motorcycle in response to an obscene gesture in 2015, 2018, or 2019 (depending on when Plaintiff reports this assault). (R. 413 (saying assault occurred in 2018), 494 (saying assault occurred in 2018), 362 (saying assault occurred in 2019), 1479 (saying assault occurred in 2015).) The other is when Plaintiff responded to being hit in the testicles with a pool cue, apparently in 2022. (R. 59-60; R. 362 (reporting assault occurred in 2022).) Plaintiff ignores that he worked through 2019 with no reported altercations in any working environment, including with his co-workers or supervisors. The Court acknowledges Plaintiff's assertion in his function reports that it was "possible" that he was fired or laid off because of problems getting along with others and later that he was fired or laid off because his problems with getting along with others. (R. 334.) But Plaintiff testified that he was laid off from his last job at Elements Health Companies

as part of reduction of force.  (R. 45.)  This, coupled with his assertion that his "former boss from United Health Group" would help him get a job in Tampa (R. 488), contradicts his assertion that he was unable to function with others even in highly stressful high-functioning positions supporting business executives.  Moreover, these statements in his function reports are contradicted by his testimony before he ALJ where he testified that he had no angry confrontations at work (R. 60-61).

Plaintiff's argument that he should have been assessed a more restrictive RFC in this regard is further contradicted by his statements that he spends time with others in person daily (regardless of his limited patience with others); he could get along with authority figures, such as supervisors; and he was protective and lived with his family and has social interactions with his neighbors that he gets along with.  (R. 55, 60-61, 333-34, 1129, 1420.)  Moreover, as noted by the ALJ, and found by this Court (*supra*, Section IV.A.1-3), the medical record does not support any additional limitations with respect to interacting with others based on Plaintiff's mental health.  Finally, as explained above, the weight the ALJ assigned to Tiderington's opinions is supported by substantial evidence.  (*See supra*, Section IV.A.3.)

Plaintiff also points to the VA's "70 percent disability rating due to trauma" to support his RFC arguments as to his ability to relate to others.  (Dkt. 6 at 18.)  The SSA's regulations provide as follows:

> Other governmental agencies and nongovernmental entities—such as the Department of Veterans Affairs, the Department of Defense, the Department of Labor, the Office of Personnel Management, State agencies, and private insurers— make disability, blindness, employability, Medicaid, workers' compensation, and other benefits decisions for their own programs using

their own rules. Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore, in claims filed (see § 404.614) on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4).

20 C.F.R. § 404.1504; *see also* 20 C.F.R. § 404.1520b(c) (providing the decision by other governmental agencies are "neither valuable nor persuasive" and "we will not provide any analysis about how we considered such evidence in our determination or decision. . . ."); *Pelkey v. Barnhart*, 433 F.3d 575, 579 (8th Cir. 2006) ("Pelkey contends that the ALJ failed to consider the disability assessment by the VA. We disagree. The ALJ should consider the VA's finding of disability, *Morrison v. Apfel,* 146 F.3d 625, 628 (8th Cir.1998), but the ALJ is not bound by the disability rating of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits.") (citation modified).

Here, the record shows that the ALJ considered the VA assessment. (R. 22.) Nothing more is required. Although the ALJ did not specifically refer to the VA's specific findings as to functioning, it is clear that the ALJ considered the underlying medical record evidence from the VA supporting the February 7, 2020 rating. *See Joshua G. v. Saul*, No. 19-CV-2467 MSK/ECW, 2021 WL 1102991, at *8 (D. Minn. Feb. 2, 2021) ("Although the ALJ did not specifically refer to the VA's 100% disability rating,

it is clear that the ALJ considered the underlying evidence supporting this rating because Mr. G's VA medical records are cited throughout the Decision.").[14]  Here, the ALJ cited and discussed Plaintiff's medical records throughout the decision noting that Plaintiff "received nearly all of his care through the Veteran's Administration (VA) health care system." (*See*, *e.g.*, R. 22; R. 23 (citing Ex. 8F/82-85, 10F/109/110/114, Ex. 10F/1100, Ex. 16F); R. 25 (citing Ex. 14E, Ex. 10F/53/86/92/96/109/145, Ex. 16F, Ex.17F/27/64).) Accordingly, the Court cannot conclude that the ALJ erred as it relates to considering the VA's disability findings regarding his mental functioning.

It is important to note that the ALJ took into account Plaintiff's ability to deal with others in the workplace by drastically limiting quantity and quality of his contact with others.  This decision is supported by substantial evidence, and to the extent that substantial evidence would support a contrary outcome of additional limitations, that is not a basis for remand.  *See Nash*, 907 F.3d at 1089.

### 3.    Subjective Symptoms

Plaintiff contends that the "ALJ's formulation of the RFC is flawed because it inaccurately downplayed the extent to which irregular sleep patterns, insomnia, obstructive sleep apnea, depression, and obesity prevent Plaintiff from frequently lifting

---

[14]    Plaintiff relies on *Bruton v. Kijakazi*, Case No. 3:20-cv-323, 2022 WL 1749828, at 4-6 (D.N.D.), and *Alice T. v. Kijakazi*, 8:21-CV-14 2021 WL 5302141, at 9-10. (D. Neb. Nov. 15, 2021), when arguing that the ALJ failed to properly consider the VA's decision (*see* Dkt. 6 at 17-18; Dkt. 14 at 6).  However, as in *Joshua G*, those courts do not require an ALJ to do more than the ALJ did here—consider the VA's decision.

25 pounds," which Plaintiff characterizes as "stating that [he] exaggerates his symptoms." (Dkt. 6 at 16.)

As set forth above, an ALJ must determine a Plaintiff's RFC based on all of the relevant evidence, including his own description of his limitations. *See Myers*, 721 F.3d at 527. An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); SSR 16-3p, 2016 WL 1119029, at *5-7 (Mar. 16, 2016) (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms); 20 C.F.R. § 404.1529(c). Here, the ALJ concluded that Plaintiff's allegations are only partially consistent with the evidence of record, as the evidence of record did not show symptoms or limitations at the severity alleged by him or that would preclude work activity within the residual functional capacity. (R. 22-23.)

To the extent that it is Plaintiff's argument that the ALJ's "boilerplate language" did not consider every factor above, "caselaw is clear the ALJ is not required to discuss each factor." *Michlitsch v. Berryhill*, No. 17-CV-3470 (MJD/TNL), 2018 WL 3150267, at *15 (D. Minn. June 12, 2018) (citing *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017); *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010); *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)), *R. & R. adopted*, 2018 WL 3150225 (D. Minn. June 27, 2018). "Credibility determinations are the province of the ALJ, and as long as good reasons and

substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (citation modified); *see Hensley*, 829 F.3d at 934 ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.") (citation modified).  To be clear, while *Polaski* and other cases use the term "credibility" in connection with subjective complaints, "[SSR] 16-3p eliminates use of the term 'credibility' and clarifies that the Commissioner's review of subjective assertions of the severity of symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between subjective assertions and the balance of the record as a whole." *Lawrence v. Saul*, 970 F.3d 989, 995 n.6 (8th Cir. 2020).  However, while "largely changing the terminology," SSR 16-3p did not change "the substantive analysis to be applied." *Id.*

With respect to Plaintiff's subjective allegations, the ALJ concluded that the determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (R. 21.)  The ALJ relied on the medical record, Plaintiff's conservative treatment as to the mental impairments, his activities of daily living (including his ability to move from Minnesota to Florida), and the fact that his employment ended because he was laid off, not due to his alleged disability.  (R. 21-23.)

While Plaintiff did report difficulties with falling asleep, the medical record shows that use of the CPAP machine helped, and Plaintiff in most instances denied any fatigue

due to his inability to sleep.  (*See*, *e.g.*, R. 653-54, 721, 765-66, 957, 1282.)  Indeed, the record indicates that Plaintiff's sleep apnea was mild and did not interfere with his ability to work.  (R. 752, 1283.)

Moreover, there is no indication in the record that Plaintiff sought or received any medication regarding his fatigue resulting from his inability to properly sleep or for that matter that it impeded his ability to function during the day.

Similarly, although the record supports instances where Plaintiff endorsed depression, Plaintiff also denied being depressed in many instances.  (*See*, *e.g.*, R. 653-54, 735, 766, 848, 957, 1138, 1198.)  Plaintiff characterized his depression as mild and reported suffering from depression even before he was in the Army.  (R. 494.)  More importantly, Plaintiff complained of his depression and received medication for its treatment, yet refused to take the medication because he had not gotten to the point where he felt the medication was necessary, and there is nothing in the record indicating that he took the medication.  (R. 412.)  This, coupled with Plaintiff's conservative treatment for depression, supports the weight that the ALJ gave Plaintiff's subjective allegations.  *See Wagner v. Astrue*, 499 F.3d 842, 853 (8th Cir. 2007) ("ALJ could discredit Wagner's subjective complaints of pain based on Dr. Cromer's observations and evidence that Wagner received minimal medical treatment for some of his alleged disabling conditions and has failed to take pain medication for such conditions."); *see also Jessica D.* v. *Bisignano*, No. 24-CV-02981 (LMP/ECW), 2025 WL 2534639, at *34 (D. Minn. July 30, 2025), *R. & R. adopted sub nom.*, 2025 WL 2533675 (D. Minn. Sept. 3, 2025) ("Plaintiff's failure to meaningfully attempt these available treatment options cuts against

her subjective complaints about her back pain.") (citation omitted).

Plaintiff suffered from obesity, and sought to lose weight, but denied any acute concerns or complaints concerning the same. (R. 848.) There is nothing in the medical record outside of reports that Plaintiff was obese that supports any functional limitations. "[I]t is not the diagnosis that becomes part of the RFC," instead the RFC "describes a Plaintiff's capabilities and limitations as a result of medical conditions." *Long M. v. Berryhill*, No. 18-CV-862 (ECW), 2019 WL 2163384, at *7 (D. Minn. May 17, 2019) (citation modified). The medical record does not support any additional functional limitations stemming from his obesity, as is evident from objective testing, including Plaintiff's normal gait, his range of motion, the strength of his extremities, and Plaintiff's normal Romberg tests. (*See*, *e.g.*, R. 693, 695-97, 731, 1076-78, 1080, 1123, 1129, 1398, 1420.) This, and the minimal treatment for obesity, supports the weight given by the ALJ to Plaintiff's subjective complaints related to his weight.

Not only does the medical record support the RFC, but Plaintiff's daily activities also cut against more onerous restrictions based on his physical and mental limitations. "[I]t is well-settled law that 'a claimant need not prove she is bedridden or completely helpless to be found disabled.'" *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). However, a claimant's daily activities are one factor an ALJ must consider when evaluating the claimant's testimony and subjective limitations. *See Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022) ("While daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain.") (citations modified).

Plaintiff focuses on the ALJ's assertion that Plaintiff was able to move between Florida and Minnesota as improved daily activity.  (Dkt. 6 at 16.)  However, this argument ignores that the ALJ also discussed the VA records "indicat[ing] that [Plaintiff] was keeping up with activities of daily living."  (R. 23.)  Here, the record shows that in August 2019, Plaintiff reported moving out of his apartment in Tampa and that his things were in storage.  (R. 1243.)  Plaintiff planned to spend four months in France.  (R. 413, 1243.)  The record also shows that Plaintiff hunted (R. 1420), engaged in contract work (R. 703), started a non-profit in France (R. 1128), went out daily and drove (R. 332), spent time with others every day (R. 333), took care of his elderly father (R. 356), was building a farmhouse (R. 1420), engaged in intense exercise (R. 1420), was working out "extensively" (R. 776), had no problems squatting or crouching (R. 360), could perform his household chores (R. 357), and travelled between Wisconsin and Minnesota to stay with his son and father (R. 1420).  This undermines Plaintiff's claims of disability and supports the ALJ's reliance on Plaintiff's activities of daily living.  *See generally, Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) (noting that "even someone with severe physical and mental impairments may nonetheless be able to work," and affirming ALJ's decision to disregard opinions of provider favoring finding of disability where claimant's self-reported daily activities of caring for her children, preparing food, doing housework, shopping, and driving a car "showed that she could work") (citation modified).

In addition, Plaintiff represented at the hearing that he ended his employment not because of his medical conditions, including his mental limitations, but because his

former employer lost its main customer and underwent a reduction of force (despite his assertion that reason was pretext for a firing).  (R. 45, 488.)  It was proper for the ALJ to discount Plaintiff's complaints based on this testimony.  *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (finding that that although claimant's long work history supported her "subjective complaints of disabling pain," "the fact that [she] was laid off from her position, rather than forced out due to her condition" undercut her claim of disability) (quoting *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998))*; see also Gregory v. Comm'r, Soc. Sec. Admin.*, 742 F. App'x 152, 155 (8th Cir. 2018).

For the reasons stated above, the Court finds that the ALJ's decision to discount Plaintiff's subjective complaints is supported by substantial evidence.[15]

### 4.    Additional Arguments Regarding Plaintiff's RFC

As part of his Step 5 argument, Plaintiff includes a litany of conclusory arguments that relate to his RFC at step 4:

> Finally, [Plaintiff's] records support a finding of a limitation to sedentary or light work. His arthritis and chronic neck pain would make him a safety risk in an environment that requires him to lift 20 or more pounds for up to one third of the workday. His knees make noises during examination. He has tried pain medication to manage his symptoms. The ALJ's decision does not contradict or adequately address all of testimony and statements regarding fatigue and pounding in the head.

(Dkt. 6 at 22.)

---

[15]    While not entirely clear, it appears that Plaintiff is also challenging the weight the ALJ assigned to Tiderington's opinions as to his physical limitations.  (*See* Dkt. 6 at 17; *see also* R. 25 (ALJ's discussion).)  However, for the same reasons stated in this section regarding Plaintiff's claims of fatigue and other physical limitations, the Court finds that the ALJ properly considered Tiderington's opinions with respect to the physical RFC.

In general, the Court need not consider an "undeveloped argument" nor divine a basis for it. *See Aulston v. Astrue*, 277 F. App'x 663, 664 (8th Cir. 2008); *see also Patricia M. v. Saul*, No. 18-CV-3462 (DSD/HB), 2020 WL 3633218, at *9 (D. Minn. Feb. 5, 2020) ("Plaintiff does not specify the aspects of the ALJ's analysis with which she disagrees or otherwise identify the facts to support her claim. Defendant characterizes this argument as an 'undeveloped argument,' and the Court agrees. The Court is not required to address such undeveloped arguments."), *R. & R. adopted sub nom.*, 2020 WL 1951748 (D. Minn. Apr. 23, 2020); *Camie P. v. Berryhill*, No. 18-CV-1401 (ECW), 2019 WL 2644256, at *5 n.3 (D. Minn. June 27, 2019) ("Plaintiff's argument that the RFC should be reassessed, with no explanation as to why a reassessment is necessary, is an undeveloped argument.") (citation modified); *Ollila v. Astrue*, No. 09-CV-3394 (JNE/AJB), 2011 WL 589037, at *11 (D. Minn. Jan. 13, 2011) (refusing to consider argument where the plaintiff failed to connect the facts of the case to the asserted error), *R. & R. adopted*, 2011 WL 589588 (D. Minn. Feb. 10, 2011). Here, Plaintiff does not fully explain why his chronic neck pain, fatigue, pounding head, arthritis and knee noise require additional limitation outside a vague assertion of "safety risk." (Dkt. 6 at 22.) Plaintiff also identifies no evidence to support this argument. When Plaintiff fails to put forth a supporting rationale or identify evidence to support an argument, the Court declines to do so on Plaintiff's behalf. *See R.H.A. v. Kijakazi*, No. 22-CV-639 (ECW), 2023 WL 1971682, at *8 (D. Minn. Feb. 13, 2023) ("Judges are not like pigs, hunting for truffles buried in briefs or the record.") (quoting *ASARCO, LLC v. Union Pac. R. R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) (citation modified).

Moreover, substantial evidence in the record as a whole supports the ALJ's decision not to include additional limitations based on these conditions. The medical record does not bear out additional physical functional limitations given the Court's previous finding as to his fatigue (*see supra*, Section IV.B.3); Plaintiff's normal gait, his range of motion, balance, and the strength to his extremities (*see, e.g.*, R. 693, 695-97, 731, 1076-78, 1080, 1123, 1129, 1398, 1420), his normal range of motion as to his neck and apparent alleviation of pain with doxycycline (*see, e.g.*, 695-97, 816 , 1384, 1387); and otherwise conservative treatment of his pain throughout the record (*see, e.g.*, R. 50, 52, 336, 692, 738, 816-17, 1383-84, 1387-88).

C.    **Plaintiff's Step Five Challenges**

The Court turns to Plaintiff's step five challenges.

Plaintiff first argues that remand is required because the hypothetical question posed to the VE was less restrictive than the RFC. (Dkt. 6 at 19.) As far as this Court can discern, Plaintiff complains that the RFC restricts him "to **perform** __less than__ **a full range** of medium work as defined in 20 CFR 404.1567(c)" (R. 20 (emphasis added)), whereas the following hypothetical posed to the VE did not have such a restriction:

> [**I**]**ndividual who is able to lift and or carry 50 pounds occasionally 25 pounds frequently,** this individual can sit up to a maximum of six hours and an eight-hour workday stand and or walk combined up to a maximum of six hours and an eight-hour workday. He should never climb ladders, ropes, or scaffolds, but can frequently climb ramps in the stairs. Our hypothetical individual can frequently balance as defined in the selective characteristics of occupations and frequently stoop, kneel, couch, crawl. He has no exposure to work around extreme heat and hazards such as unprotected heights and fast and dangerous moving machinery. Our hypothetical individual can tolerate occasional cursory non-collaborative interactions with coworkers but is not able to engage in work that is in tandem or interdependent with

> coworkers. He is limited to only incidental contact with the public, meaning he could work in proximity to the public but should have no responsibility for serving the public directly. Our hypothetical individual is limited to a moderate noise environment for the term moderate is defined as a business office for typewriters or used department store, grocery store light traffic and fast-food restaurant and off hours.

(R. 63-64 (emphasis added).)  Plaintiff also expresses confusion as to what **performing less than a full range** of medium work means.  (Dkt. 6 at 19.)  The Court rejects these arguments.  Medium work as defined in 20 C.F.R. § 404.1567(c) "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).  However, SSR 83-14 (cited by the ALJ at R. 26), makes clear that vocational testimony is used to ascertain the extent to which nonexertional limitations—including the ability to maintain equilibrium, mental limitations, and limitations as to the ability to work in certain environmental conditions— erode the occupational base for an exertional category.  *See* SSR 83-14, 1983 WL 31254 at *2 (1983).  SSR 83-14 also provides:

> 3. *Medium exertion combined with a nonexertional impairment*. Most medium jobs, like most light jobs, require the worker to stand or walk most of the time. Also, as in light work, most unskilled medium jobs require gross use of the hands to grasp, hold, and turn objects rather than use of the fingers for fine movements of small objects. Medium work is distinct from the less strenuous levels in the activities needed to accomplish the considerable lifting and carrying involved for the full range of medium work. A maximum of 50 pounds may be lifted at a time, with frequent lifting or carrying of objects weighing up to 25 pounds. (Frequent in this context means from one-third to two-thirds of the workday.) Consequently, to perform the full range of medium work as defined, a person must be able to do both frequent stooping and frequent crouching--bending both the back and the legs--in order to move objects from one level to another or to move the objects near foot level. While individual occupations classified as medium work vary in exertional demands from just above the light work requirements to the full range of medium work, any limitation of these functional abilities must be

considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found capable of medium work.

In jobs at the medium level of exertion, there is more likelihood than in light work that such factors as the ability to ascend or descend ladders and scaffolding, kneel, and crawl will be a part of the work requirement. However, limitations of these activities would not significantly affect the occupational base.

As in light work, inability to use the finger tips to sense the temperature or texture of an object is an example of a nonexertional limitation which would have very little effect on the potential unskilled medium occupational base. The need to avoid environments which contain objects or substances commonly known not to exist in most workplaces would be an obvious example of a restriction which does not significantly affect the medium occupational base.

Where nonexertional limitations or restrictions within the medium work category are between the examples above, a decisionmaker will often require the assistance of a VS.

SSR 83-14 at *5-6. Here, the ALJ found additional nonexertional limitations and properly consulted with the VE with a hypothetical that included all the limitations contained in the RFC—which is a less than full range Medium RFC by virtue of the additional nonexertional limitations included by the ALJ. *See Bandy v. Shalala*, 16 F.3d 1227 (8th Cir. 1994) (unpublished) ("The ALJ did not call a vocational expert to satisfy the Secretary's burden on step five of the sequential analysis; rather, he relied on the guidelines. An ALJ may rely on the guidelines if the claimant's vocational factors and RFC are the same as the corresponding criteria in the guideline rule. If a claimant has significant nonexertional limitations, such as postural limitations, preventing the full range of work, an ALJ may not rely solely on the guidelines.") (citation modified). As such, the Court finds that remand is not appropriate based on Plaintiff's arguments.

64

The Court turns to Plaintiff's second argument, which is that the ALJ erred by relying on the VE's testimony because she did not ask if the occupations propounded by the VE are performed differently today than described in the DOT.  (Dkt. 6 at 20.)  As an example, Plaintiff claims the hospital cleaner position was last updated in 1977 and the laboratory equipment cleaner was last updated in 1988.[16]  (*Id.*)  Indeed, the DOT was last updated in 1991.  *See Kennedy v. Colvin*, No. 2:13-CV-02253, 2014 WL 7335539, at *4 (W.D. Ark. Dec. 22, 2014).  Nevertheless, the Eighth Circuit has concluded that SSR 00–4p dictates that "[i]n making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy."  *See Moore v. Colvin*, 769 F.3d 987, 989 n.2 (8th Cir. 2014) (quoting SSR 00–4p, 65 Fed. Reg. 75759-01, 75760 (December 4, 2000)); *see also* 20 C.F.R. § 404.1566(d).  Therefore, the Court finds no legal error in the ALJ's reliance on the DOT.  *See Neil M. v. Saul*, No. 19-CV-02434 (ECW), 2020 WL 5798488, at *25 (D. Minn. Sept. 29, 2020), *aff'd sub nom. Medved v. Kijakazi*, 855 F. App'x 311 (8th Cir. 2021); *see also Anthony M. v. O'Malley*, 23-cv-178-DJF, 2024 WL 453602 at *9 (D. Minn. Feb. 6, 2024).

Finally, the Court turns to Plaintiff's arguments that it was unclear from where the VE acquired the job numbers data and that the ALJ erred in relying on the VE because the VE did not include a regional breakdown of the number of jobs.  (Dkt. 6 at 21-22;

---

[16]    Plaintiff makes an unsupported argument that the laboratory equipment cleaner job "has changed since then."  (Dkt. 6 at 21.)  Such unsupported arguments do not provide a basis for reversal or remand.

Dkt. 14 at 6-7.)  The SSA rescinded and replaced SSR 00-4p with SSR 24-3p on January 6, 2025.  *See* SSR 24-3p, 89 Fed. Reg. 97158 (Dec. 6, 2024).  While SSR 24-3p requires that the VE identify the data sources and explain their general approach as to estimating job numbers that they rely upon, SSR 00-4p does not.  *Compare*, SSR 00-4p, 65 Fed. Reg. 75759-01 (Dec. 4, 2000), *with* SSR 24-3p, 89 Fed. Reg. 97158, 97160 (Dec. 6, 2024).  Because the ALJ's decision was issued before January 6, 2025, the Court applies SSR 00-4p.  *See* SSR 24-3p, 89 Fed. Reg. 97158, 97160, 97159 n.1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").  SSR 00-4p does not require identification of data sources and an explanation of their general approach as to job numbers.  Indeed, Plaintiff has identified no authority supporting this argument.  The Court finds no error of law that would support remand on the ground that the VE did not provide a clear explanation where he acquired the job numbers data.

The Court also rejects Plaintiff's argument that the ALJ could not properly rely upon the VE because he did not provide regional numbers for the positions propounded. The ALJ relied on the VE's testimony that the hypothetical person, based on RFC, could perform the following positions: Custodian, DOT# 389.667-010, with 38,000 jobs in the national economy; Hospital Housekeeper, DOT# 323.687-010, with 40,000 jobs in the national economy; and Lab Equipment Cleaner, DOT# 381.687-022, with 25,000 jobs in the national economy.  (R. 26-27, 65.)

The Eighth Circuit "leave[s] to the trial judge's common sense the application of the significant numbers requirement to a particular claimant's factual situation."  *Hall v.*

*Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997) (citing *Johnson v. Chater*, 108 F.3d 178,

180 (8th Cir.1997)).  The Court may consider a number of factors, including the type of

work and whether the job is of the type that would be expected to be isolated to specific

locations. *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988).

There is a split amongst district courts within the Eighth Circuit, where some

courts have held that national numbers for DOT occupations are insufficient to carry the

Commissioner's burden at step five, as there must be direct evidence of a significant

number of jobs either in the claimant's "region" or in several regions; and other courts

have concluded that "evidence of jobs existing nationally does constitute evidence of

work existing in several regions of the country, at least where there is nothing in the

number of jobs or the nature of the jobs identified to indicate that those jobs would exist

only in limited numbers in isolated regions of the country." *Samantha M. A. v. O'Malley*,

No. 22-CV-3119 (TNL), 2024 WL 841270, at *7 (D. Minn. Feb. 28, 2024) (as modified)

(collecting cases).  The Court agrees with the majority of courts that have taken a

pragmatic approach and "found regional numbers are not necessarily required to show

work exists in significant numbers in the national economy." *Sherry L. H. v. O'Malley*,

No. 23-CV-4027-CJW-KEM, 2024 WL 3783575, at *15 (N.D. Iowa Aug. 12, 2024, *R. &

R. adopted*, 2024 WL 4227048 (N.D. Iowa Sept. 18, 2024).  "As the *Shari B.* court

explained, 'many courts appear to draw the line between a "significant" and an

insignificant number of jobs in the national economy—without evidence of the number of

jobs available locally—at around 20,000 jobs.'" *Tanya S. v. O'Malley*, No. 23-CV-1416,

2024 WL 3858155, at *12 (D. Minn. Aug. 19, 2024) (collecting cases and finding that

"absent any evidence to the contrary, the evidence of 22,000 semiconductor bonder jobs nationally is sufficient to meet the ALJ's burden at step five") (quoting *Shari B. v. Kijakazi*, No. 22-CV-1539 (DJF), 2023 WL 6130679 at *8 (D. Minn. Sept. 19, 2023)); *see also Nicolas C. J. v. Kijakazi*, 20-cv-1340 (WMW/ECW), 2022 WL 1109810, at *25 (D. Minn. Jan. 20, 2022) (finding 20,500 jobs nationally to be a significant number), *R. & R. adopted*, 2022 WL 807605 (D. Minn. Mar. 17, 2022). The Lab Equipment Cleaner position, DOT# 381.687-022 description, with 25,000 jobs in the national economy[17] does not suggest that such positions are limited to a particular region. Although it is close, the Court finds that the evidence supporting the existence of 25,000 jobs in the national economy is sufficient to meet the ALJ's burden at step five. Remand is not appropriate on this ground.

## V.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS ORDERED** that:

1.    Plaintiff James R.'s Brief seeking remand or reversal of the Commissioner's decision to deny him Title II Disability Insurance Benefits (Dkt. 6) is **DENIED**;

2.    Defendant Commissioner of Social Security Administration, Frank Bisignano's brief in opposition (Dkt. 13) seeking dismissal of Plaintiff's Complaint is **GRANTED**; and

---

[17]    The Court excludes the other positions propounded by the VE for the reasons stated in Section IV.B.1 of this Order.

3.      Plaintiff's Complaint (Dkt. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 26, 2025                    _s/Elizabeth Cowan Wright_
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge